UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA,                          S4 05 Cr. 1067 KMK

      v.                                              NOTICE OF MOTION TO DISMISS
                                                   PURSUANT TO RULE 29 OF THE
ROBERTO MONTGOMERY, et al.,                         FEDERAL RULES OF CRIMINAL
         Defendants.                              PROCEDURE._____
--------------------------------------------------------X

      PLEASE TAKE NOTICE, that the defendant ROBERTO MONTGOMERY, by his

attorney THOMAS H. NOOTER, ESQ., upon the annexed Declaration of Counsel and

Memorandum of Law, moves this court on for an order dismissing the count fifteen (the sole

remaining count against the defendant) pursuant to Rule 29 of the Federal Rules of Criminal

Procedure, and for such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       June 11, 2007

                                  Yours,

                                  */s/ Thomas H. Nooter*_____
                                  THOMAS H. NOOTER, ESQ.
                                  Attorney for Defendant
                                  Freeman, Nooter & Ginsberg
                                  30 Vesey Street, Suite 100
                                  New York, NY 10007
                                  (212) 608-0808
                                  Fax: (212) 962-9696
                                  Email: thnooter@cs.com

TO:    Clerk of the Court, S.D.N.Y.
        Office of the United States Attorney
            for the Southern District of New York
            Attention: AUSA Danya Perry, Esq.,
            and AUSA Daniel Levy, Esq.

-1-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

UNITED STATES OF AMERICA,                           S4 05 Cr. 1067 KMK

      v.

ROBERTO MONTGOMERY, et al.,                         DECLARATION OF COUNSEL IN
           Defendants.                          SUPPORT OF MOTION TO DISMISS
                                                    PURSUANT TO RULE 29._____

----------------------------------------------------------X

      THOMAS H. NOOTER, ESQ., being an attorney duly admitted to the practice of law in

the States of New York and California and in the Courts of the United States, does hereby affirm

under penalties of perjury and pursuant to 28 U.S.C. § 1765 that the following is true:

      1.  I am the attorney for the defendant ROBERTO MONTGOMERY herein, and as such I

am fully familiar with the facts and circumstances stated herein.

      2.  I make this declaration on personal knowledge of the evidence and testimony

presented at the trial in this matter, having been the attorney who represented the defendant

throughout the trial.

      3.  I make this declaration in support of a) a renewal of my motion for a judgment of

acquittal made pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure[1], insofar as that

application applied to the sole remaining count of the indictment, which was made at the close of

the government's case in chief and upon which decision was reserved by this court pursuant to

Rule (b), and b) pursuant to Rule 29 (c).

      4.  This motion is being filed on June 11, 2007, which was the date fixed by the court

---

      [1]Hereinafter, all references to "Rule ..." will refer to the Federal Rules of Criminal
Procedure unless otherwise specifically noted.

within seven days of the return by the jury of a verdict in this case, and is therefore timely with respect to the portion herein which moves for relief pursuant to Rule 29(c).

5. I make this motion directed to Count 15 (Count five as submitted to the jury) based on a lack of proof of venue in the Southern District and upon a failure to prove the element of the count which related to theft by stolen check. No motion to amend the pleadings to conform to the proof was made by the government before the close of the trial, and therefore the sufficiency of the charges as stated in the indictment is at issue.

Facts Related to Count 15 from the Government's Case:

6. The testimony concerning the attempt to steal cars using stolen checks came from Natasha Singh and from Gene Morales.

7. Singh stated that the entire plan to purchase cars in Florida using a counterfeit check was hatched and carried out by Douglas Shyne and Toybe Bennett, and that the defendant Roberto Montgomery was only recruited to participate after the cars had been purchased and one of them needed to be picked up in Florida. On venue, she said that the car was to be resold to a dealer "on Hillside Avenue" (there is none in the Southern District; Hillside Avenue is in Queens, in the Eastern District), but that the car was parked (she apparently heard through Shyne) in Manhattan after Mr. Montgomery brought it up from Florida. Her testimony on these points is reproduced here (from trial transcript of April 16, 2007, page 284 et seq.):

```
12    Q.  Were you aware of some cars that were purchased with a
13    counterfeit check involving Mr. Shyne?
14    A.  Yes.
15    Q.  What did you recall?  What did Mr. Shyne tell you, if
16    anything, about this counterfeit check?
```

17   A.  Just that they purchased some car -- Toybe purchased a car

18   on their, Dmitriy Makarevich, and there was problems bringing

19   the car, on a timely basis, to New York.  So, they had to get

20   somebody to go over there to bring one of the cars.

21   Q.  Did Mr. Shyne tell you who went to go get one of the cars?

22   A.  Yes.

23   Q.  Who was that?

24   A.  It was Butch.

25   Q.  Did Mr. Shyne tell you the name of the auto dealership

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

284

74G5MON4                     Singh - direct

1   where these cars were purchased from?

2   A.  Yes.

3   Q.  Do you recall what that is?

4   A.  Euro Motor Sports.

5   Q.  Is there a particular reason why you remember that name?

6   A.  Yes.  Because Douglas did business with Euro Motor Sports

7   before he sold the car to them.

8   Q.  Do you recall what car he sold to them?

9   A.  Yes.  It was a sports car, a Maserati.

10   Q.  Is there anything in particular about that sale that sticks

11   out in your mind?

12   A.  Yes.  Because the check that he got from Euro Motor Sports

13   for that car, he later, at some point, re-made that check.

14   Q.  How do you know that?

15   A.  Because he told me.

16   Q.  By the way, do you know where Mr. Shyne got the money in

-4-

17    the first place to buy the Maserati?

18    A.  From the bad checks he -- instead of depositing the check

19    into my account he would then take that check and pay off the

20    Maserati.  That's what he did -- took the check, I don't know

21    from which account exactly, which bad check, but he took the

22    check, paid off the Maserati, and then turned around and sold

23    it to Euro Motor Sports.

24    Q.  Do you know how many cars were -- do you know how big the

25    counterfeit check was that Mr. Bennett used to purchase cars

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

285

74G5MON4                    Singh - direct

1     from Euro Motor Sports?

2     A.  I believe I heard around $300,000.  I'm not sure.

3     Q.  And, do you know how many cars were purchased?

4     A.  I heard him talking about three.  I heard Douglas and Toybe

5     talking about three cars.

6     Q.  And, what names name did Mr. Bennett use -- did you hear

7     any name that Mr. Bennett used in connection with purchasing

8     these cars?

9     A.  Yes.  Dmitriy Makarevich.

10    Q.  How did you hear that?

11    A.  Because Douglas and Toybe were together when Toybe called

12    the dealer and it was at my house.  Toybe called the dealer to

13    transact the business and he said:  Hi, it's Makarevich here.

14    Q.  You said earlier there was a problem getting the car back

15    on a timely basis.  What do you mean by that?

16    A.  Well, the arrangement they had was for the truck to bring

-5-

17    the cars but the truck had broken down somewhere along the line

18    so it delayed the car maybe a day or two.  And they were

19    getting nervous because they wanted to sell the car fast before

20    the check comes back.

21         So, they decided to get Butch to go get the car.

22    Q.  Are you aware of how Mr. Montgomery went down to Florida to

23    pick up the car?

24    A.  No.  I heard Douglas talking about -- Douglas talking to

25    Toybe on the phone about taking a flight but I don't know what

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

286

74G5MON4                    Singh - direct

1    decision they made after that.

2    Q.  Were you present during any communications with

3    Mr. Montgomery while he was on, at any point during his trip to

4    Florida to pick up the car?

5    A.  Yes.  I was home, Douglas was home, and he called Toybe and

6    they called Toybe and returned the call to Butch to ask where

7    are you?  Have you left yet?  And, during the course of his

8    trip they were communicating with him.

9    Q.  Did Mr. Shyne and Mr. Bennett tell you what the plan was

10   with respect to this car?

11   A.  Douglas told me that they were trying to sell the car to a

12   car dealership on Hillside Avenue.

13   Q.  Did you hear Mr. Shyne giving any instructions to

14   Mr. Montgomery while he was on route?

15   A.  Yes; telling him to hurry up and get back here fast.  Just

16   don't go hang out with the car.  Just hurry up and get back

-6-

17    here.

18    Q.  Are you aware of where the car was brought after Mr. -- did

19    Mr. Montgomery in fact bring the car back up to the New York

20    area?

21    A.  Yes.

22    Q.  And how do you know that?

23    A.  Because Douglas was home again and Toybe said the car was

24    here.  And Douglas hung the phone up and says, He's here.  The

25    car is in New York.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

287

74G5MON4                    Singh - direct

1    Q.  Did he tell you specifically where it was in New York?

2    A.  No, I don't know when he came with the car where it was.  I

3    know up to a point they parked it in the garage.

4    Q.  Do you know where they parked it?

5    A.  In Manhattan.

6    Q.  Did you ever learn that the counterfeit check that was used

7    to purchase the car in fact was -- went bad, so to speak?

8    A.  Yes.

9    Q.  Do you understand what I mean by went bad?

10   A.  Came back to the -- bounced.

11   Q.  It was discovered to be counterfeited is what I meant.

12         Did you learn at some point that the check was

13   discovered to be counterfeit?

14   A.  Yes.

8.  On cross-examination Natasha Singh stated as follows (from trial transcript of April

17, 2007), page 549:

-7-

549

74HJMON3                    Sing - cross

1    Q.  You said that there were three cars bought from Euro

2    Motorsports, to your knowledge?

3    A.  Yes.  I am not a hundred percent it was three.  I said,

4    "approximately."

5    Q.  It might be three, it might be four?

6    A.  I don't know.

7    Q.  You said they were purchased by telephone.  Is that right?

8    A.  Yeah, the deal was done by telephone.

9    Q.  The people who made the calls were Douglas and Toybe

10   Bennett, correct?

11   A.  I believe it was Toybe Bennett making the deal and on

12   Douglas's telephone.

13   Q.  You were there in the room when that happened?

14   A.  Yes.

15   Q.  Roberto Montgomery was not there in the room.  Is that

16   right?

17   A.  No, he was not.

9.  Gene Morales was the car dealer in Florida who "sold" the vehicles. Note that the indictment specifies that the object of the conspiracy was: "to wit, TOYBE BENNETT, ROBERTO MONTGOMERY, and others used a counterfeit check to purchase at least three vehicles in Florida, which the conspirators subsequently transported or caused to be transported to New York ..." Although Mr. Morales discussed receiving several checks on the date that the defendant Roberto Montgomery came to Florida, the only one related to the charges in the indictment is the check for $277,000 which was sent by Federal Express from Brooklyn, New

-8-

York (in the Eastern District of New York) and received on November 17 or November 18, 2005. T. 1500-1501. One of the three cars purchased with this check was a Porsche Cayenne, which was in Teterboro, New Jersey at the time the transaction occurred. T. 1503-1504. Morales was told that someone had picked up that car, but there was no other evidence about where that car went (and whether it was taken to the Southern District of New York).

10.   Note that Morales said that "Dmitry" (really Toybe Bennett), stated that he had a partner, and referred to the partner's "wife;" this is consistent with Natasha Singh's testimony that it was Toybe Bennett and Douglas Shyne (who has a wife, Natasha Singh, as opposed to Roberto Montgomery, who is not married) were the ones who ordered the car and that Douglas Shyne was the "partner" to which Bennett referred, although he then said money was wired to Cynthia Montgomery (Roberto's sister, not wife) for a car which he purchased from Bennett. T. 1492.

11.   The other two cars were Mercedes, an SL55 which was picked up by the defendant at the dealership and driven away, and an SL500, which Morales arranged to ship. T. 1499-1500, T. 1504. The bills of sale for these cars (Exhibits 97 through 99) were sent to Morales "by Dmitry" by Federal Express (no evidence was offered as to where the second Fedex package was sent from). T. 1508-1509.

12.   After Morales learned that there was a problem with the $277,000 check, he arranged for the Mercedes SL500, which was being shipped on a truck, to be returned to him: he stated he "called the truck ... to turn around and come back." T. 1524. There was no evidence of whether this truck had even crossed the state line before it was turned around, and no evidence that it had ever come to the Southern District of New York.

13.   With respect to the third car – the Mercedes SL55 which was picked up in Florida by Roberto Montgomery, there was conflicting testimony on where in the New York area it was brought, and no evidence of the actual route taken. Before discussing that evidence, however, it should be noted that the crime with respect to the moving of the only car that might have come to the Southern District of New York was completed when the car was driven out of Florida (presumably into Georgia): the indictment states that the cars "crossed a State boundary after being stolen," and thus that element of the charged crime was completed when the car left the State of Florida, regardless of where in New York it eventually arrived.

14.   Morales claimed that Mr. Montgomery signed one of the bills of sale (Gov't. Exhibit 96) in his presence at the dealership for the three cars which were being purchased with the $277,000 check (a point which was hotly disputed based on handwriting and the defendant's testimony). T. 1507-1508, 1510-1513. He had a convoluted explanation for why the bill of sale came to him by Fedex already signed by only Bennett (using his assumed name), already signed by his manager (who should not have signed it before it was signed by the buyers), so that he had to have Mr. Montgomery sign it in his presence on November 30th (even though it was dated November 29th). T. 1507, 1510-1513.

15.   He also claimed that the defendant handed him an envelope ("like a Fedex envelope, or a DHL envelope" T. 1557) containing two check for the purchase of other cars, but that those purchases were never completed. T. 1556-1561.

16.   Morales testified that Mr. Montgomery had certain conversations with him, and that he provided him with an envelope containing other checks for use in the purchase of other cars. T. 1506,  T. 1518-1519, 1556-1557, 1581-1582. He also said he gave Roberto Montgomery two

checks representing the refund of New York sales tax on the three cars, which were both dated in June of 2005 (due to a computer error), and one of which was deposited on November 26, 2004 (four days before Roberto Montgomery was in Florida) and the other of which was deposited on November 30, 2004 (the same day). T. 1515-1517, 1581-1582. No evidence was presented on whether these checks were deposited in bank branches in the Southern District of New York.

Facts Related to Count 15 from the Defendant's case:

17. Mr. Montgomery testified to the events related to his involvement in the cars transactions. Since, for the purposes of these motions (the Rule 29(a) and Rule 29(c) motions) this Court must view the facts in the light most favorable to the government, the only relevant aspects would be whether the defendant established, through his testimony, some fact that the government failed to prove otherwise.

18. Mr. Montgomery admitted picking up the Mercedes car from Florida and driving it back to the New York area, but he did not give his route or any other fact which would have placed any part of his activities in the Southern District of New York. He said that he deposited one of the two checks from Euro Motor Sports in a Bank of America account on Eastern Parkway (in Brooklyn), and that he did not deposit the other one himself. T. 2239. He said he parked the car in a parking lot in Brooklyn (the E.D.N.Y.) next to where he was staying with his girlfriend, and delivered it the next day to Toybe Bennett "right off Flatbush" [Flatbush Avenue, in Brooklyn]. T. 2246, 2248. He was asked on cross-examination whether he had attended a meeting at Potamkin car dealership, but he said that he had not and no other proof concerning such a meeting was offered by the Government. T. 2474-2475.

WHEREFORE, the defendant Roberto Montgomery moves for a judgment of acquittal

based on the failure of the government to prove venue in the Southern District for count 15, and

based on the failure of the government to prove that the defendant had knowledge that the cars

were being stolen through the use of a counterfeit or altered check, and for such other and further

relief as the court deems just and proper.

Dated:  New York, New York
            June 11, 2007

                                            _/s/ Thomas H. Nooter_____
                                            THOMAS H. NOOTER, ESQ.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA,

                                    S4 05 Cr. 1067 KMK

      v.


ROBERTO MONTGOMERY, et al.,
              Defendants.
--------------------------------------------------------X

MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS PURSUANT TO
<u>RULE 29 OF THEFEDERAL RULES OF CRIMINAL PROCEDURE.</u>

<u>Statement of Facts</u>

Please see the annexed declaration of counsel for a recitation of the facts relevant to these

motions.

<u>Argument</u>

POINT I

THE GOVERNMENT FAILED TO ESTABLISH SUFFICIENT
CONTACTS WITH THE SOUTHERN DISTRICT OF NEW
YORK TO MEET THE REQUIREMENT OF VENUE.

At the close of the government's case, when it first became clear that there was a failure

of evidence on venue for Count 15 of the Indictment, counsel for the defendant moved to dismiss

the count pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure. In support of the

motion defense counsel made available to the Court a memorandum of law submitted in

connection with another case which contained the basic legal principles as they stand in the

Second Circuit on venue. The Court reserved decision on the motion, and the defendant moves

for a decision here.

-1-

At the time of the charge conference in this case the Court provided defense counsel with the citation of a Second Circuit case[2] which stated that for purposes of the charge to the jury on venue, that a statement that a finding that any act committed in the furtherance of the conspiracy which occurred in the district of trial would be sufficient to establish venue, even though this language appears to be contracted by the "substantial contacts" test which controls the Court's venue decision on a motion to dismiss (or transfer) based on venue.

Addressing this apparent contradiction first, it is the position of the defense that the Court's legal decision on a venue motion and the jury's finding on the sufficiency of the venue "element" are not the same. Most notably, the Court must take the facts in the light most favorable to the government, but must also consider several other factors (such as the convenience of witnesses and general fairness of making a defendant face trial in a distant location) which are not presented to a jury for consideration. The jury, on the other hand, is free to find, based on credibility of witnesses, that the proof is lacking, even if the evidence "taken in the light most favorable to the government" might be facially sufficient. Thus it would appear that the Court is bound by a different set of rules than apply to the jury's finding, and it is that set of rules which should control the decision on this motion.

The "Substantial Contacts" Test:

The Government bears the burden of proving, by a preponderance of the evidence, that venue exists. United States v. Stephenson, 895 F.2d 867, 874 (2d Cir. 1990). Venue is proper in any district in which the crime is committed. Fed. R. Crim. P. 18; 18 U.S.C. § 3237(a) (1988). In a prosecution for conspiracy, venue is proper in any district in which "an overt act in furtherance

---

[2]United States v. Svoboda, 347 F.3d 471 (2d Cir. 2003).

of the conspiracy was committed by any of the coconspirators." United States v.Ramirez-Amaya,

812 F.2d 813, 816 (2d Cir. 1987), United States v. Naranjo, 14 F.3d 145, 147 (2d Cir. 1994).

This would be easier to determine if the overt acts listed in the indictment clearly included an act

committed in the Southern District of New York. Of the three listed, only one even refers to New

York, by saying that the co-conspirators caused at least one vehicle to be transferred across a

State line to "New York, New York," which as we know, includes TWO separate federal

districts, the Southern District and the Eastern District of New York. Furthermore, there was no

evidence in this case that the conspiracy was formed in the Southern District of New York: the

evidence provided by Natasha Singh shows that the conspiracy was formed by Toybe Bennett

and Douglas Shyne in Hillside, Queens, when they started calling Euro Motor Sports to purchase

cars from her home.

     The "act-in-furtherance" rule has been modified, in any event, by the Second Circuit to

include a "substantial contacts" test to be met to establish venue. The leading Second Circuit case

on venue in conspiracy cases is United States v. Saavedra, 223 F.3d 85 (2d Cir. 2000), which

states that the constitutional and statutory basis for requiring proof of venue is as follows:

> The constitutional limits on where a criminal defendant can be brought to trial
> derive from two separate provisions of the Constitution and also from the Federal
> Rules of Criminal Procedure. Article III requires that "the trial of all Crimes . . .
> shall be held in the State where the said Crimes shall have been committed." U.S.
> Const. art. III, § 2, cl. 3. The Bill of Rights in the Sixth Amendment further
> clarifies the appropriate forum for venue, specifying that "in all criminal
> prosecutions, the accused shall enjoy the right to a speedy and public trial, by an
> impartial jury of the State and district wherein the crime shall have been
> committed." Rule 18 of the Federal Rules of Criminal Procedure codifies the
> constitutional command, stating that "prosecution shall be had in a district in
> which the offense was committed." Id. at 88.

The Second Circuit adopted the "substantial contacts" test for crimes which are of a

"continuing" nature (such as conspiracies) from the Second Circuit's decision in  United States v.

Reed, 773 F.2d 477, 481 (2d Cir. 1985), reasoning as follows:

> To determine whether the application of a venue provision in a given prosecution
> comports with constitutional safeguards, a court should ask whether the criminal
> acts in question bear "substantial contacts" with any given venue. United States v.
> Reed, [*supra*]. The substantial contacts rule offers guidance on how to determine
> whether the location of venue is constitutional, especially in those cases where the
> defendant's acts did not take place within the district selected as the venue for
> trial. While it does not represent a formal constitutional test, Reed is helpful in
> determining whether a chosen venue is unfair or prejudicial to a defendant. This
> test takes into account four main factors: (1) the site of the crime, (2) its elements
> and nature, (3) the place where the effect of the criminal conduct occurs, and (4)
> suitability of the venue chosen for accurate factfinding. See id. at 481. Id. at 92-
> 93.

It should be noted here that these four factors are not the same as the ones given in the

approved jury charge on the "element" of venue [I note that sometimes "venue" is described as

an element of the crime even though it need only be shown by a preponderance of the evidence].

In United States v. Kim, 246 F.3d 186 (2d Cir. 2001), which was a wire fraud case, the

court went on to refine the form of analysis as follows:

> Pursuant to the Sixth Amendment and Fed. R. Crim. P. 18, venue is proper in any
> district where a crime was "committed." See United States v. Saavedra, 223 F.3d
> 85, 88 (2d Cir. 2000). The challenge, of course, comes in determining what
> "committed" means for the purposes of a specific crime. In performing such an
> inquiry, our court has traditionally looked at the "key verbs" defining the criminal
> offense. See United States v. Brennan, 183 F.3d 139, 145 (2d Cir. 1999); United
> States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1189 (2d Cir. 1989). The
> Supreme Court, however, recently warned against an overly rigid application of
> the key verb test, in which other relevant statutory language might be ignored and
> prohibited conduct missed. See United States v. Rodriguez-Moreno, 526 U.S.
> 275, 280, 143 L. Ed. 2d 388, 119 S. Ct. 1239 (1999). Instead, the Supreme Court
> directed courts to first identify the conduct constituting the offense and then
> determine where that conduct occurred. See id. at 279; United States v. Cabrales,
> 524 U.S. 1, 6-7, 141 L. Ed. 2d 1, 118 S. Ct. 1772 (1998). Id. at 191.

There is also a "foreseeability" factor to be considered (whether the defendant could have foreseen that the conspiracy to which he is alleged to have joined would involve the district of trial) discussed in the Second Circuit's decision in United States v. Svoboda, 347 F.3d 471, 483 (2d Cir. 2003). The Court, after citing United States v. Kim, 246 F.3d 186, 188 (2d Cir. 2001) and United States v. Bezmalinovic, 962 F. Supp. 435 (S.D.N.Y. 1997) stated:

> Taken together, Kim and Bezmalinovic indicate that venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue. See Kim, 246 F.3d at 192 (finding venue proper where the defendant "caused communications to be transmitted into and out of the Southern District when he approved fraudulent invoices knowing that [the victim] paid its vendors from New York banks"); Bezmalinovic, 962 F. Supp. at 438 (finding venue improper because the defendant neither intended nor could have foreseen the acts that occurred in the district of venue). Id. at 347 F.3d 483.

Natasha Singh testified that the plan was to resell the cars to a dealer "on Hillside Avenue" (in Queens). T. 286. To the extent that Roberto Montgomery knew of this plan, or is charged with knowing it as a co-conspirator, there was no evidence that he could have foreseen any part of this conspiracy taking place in, or having an impact upon, the Southern District of New York.

The other basis for venue in a conspiracy consisting of ongoing activity is that the principal location of the conspiracy is in the district of prosecution, even if the principal acts of the particular defendant on trial were not committed there. This is the holding of United States v. Saavedra, *supra* at 94, which stated:

> As a consequence, venue in the district where that enterprise is principally based is appropriate within Congress' definition of an ongoing, continuing offense. Wholly separate activities in a district where the racketeering enterprise does not regularly operate are

much more akin to "anterior criminal conduct" begun and
completed by others that the Supreme Court rejected as a basis for
venue in Cabrales [United States v. Cabrales, 524 U.S. 1 (1998)].
...

The Second Circuit in United States v. Svoboda, 347 F.3d 471, 483 (2d Cir. 2003),
supra, upheld the use of the jury charge which says that venue for a conspiracy can be supported
either if the conspiracy was formed in the district of prosecution, or if one of the overt acts of the
conspiracy was committed in the district of prosecution. United States v. Smith, 198 F.3d 377,
382 (2d Cir. 1999) (quoting United States v. Naranjo, 14 F.3d 145, 147 (2d Cir. 1994)[3]. The
court did so as a matter of "plain error" since the objection had not been preserved. The court
also noted that " the acts in furtherance, i.e., the trades executed in the Southern District, are also
the acts constituting the offenses charged." Id. at 485. Thus, the factual basis for holding that an
overt act committed in furtherance of the conspiracy was not controversial.

Here, however, the case is different. At the most the evidence showed that Natasha Singh
was told by a co-conspirator that the car brought back from Florida to "New York" by Roberto
Montgomery was parked, after it arrived, in a garage in Manhattan. In fact, the way she stated it,
this could be a different parking from the one Roberto Montgomery testified to (parking the car
by himself in Brooklyn after arriving home from the long drive), vs. "I know up to a point they
parked it in the garage ... in Manhattan." T. 287 [Emphasis added]. There was no logical reason
given for why it would be parked in Manhattan by Mr. Montgomery since nobody involved in the
conspiracy lived there, and it was delivered (according to uncontroverted evidence in the defense
case) to a co-conspirator in the Eastern District. After that, it may have gone to a garage in

---

[3]This was a case I argued, unfortunately.

-6-

Manhattan.

No other event was shown to have taken place in, or involve, the Southern District. No other cars were delivered to the Southern District, no calls were made from there, no paperwork was sent to or from there, no checks were created or deposited there, and no evidence exists as to whether the sole car which clearly made it to the New York area passed through the Southern District.

Finally, the object of the conspiracy as charged in count 15 was completed when the car crossed the Florida State line into Georgia. The indictment defines this conspiracy as one to purchase "at least" three vehicles in Florida, which the co-conspirators "subsequently transported or caused to be transported to New York, in violation of Title 18, United States Code, Section 2315." The only car which was transported or caused to be transported to New York was the car Roberto Montgomery picked up in Florida. New York, includes two federal districts, only one of which is the district of trial. The car was "stolen" or converted once it was taken by Roberto Montgomery after having been paid for with a bad check. The violation of 18 U.S.C. § 2315 was completed once the car, "after being stolen, unlawfully converted, and taken," initially crossed ANY state boundary, the first of which had to be the state line of Florida.[4]

None of the Second Circuit decisions on venue actually confront the difference between applying the "substantial contacts" test with the "any act in furtherance" tests, which are stated in

_____

[4]§ 2315 states as follows: "Sale or receipt of stolen goods, securities, moneys, or fraudulent State tax stamps: Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $ 5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $ 500 or more, which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken..." [Emphasis added].

cases as if they are interchangeable. These cases do not discuss why several of the <u>Reed</u> factors, "(3) the place where the effect of the criminal conduct occurs, and (4) suitability of the venue chosen for accurate factfinding," are not charged to the jury when they are charged on the "element" of venue. The crime could have an effect on a district even though no act in furtherance was actually committed there, and the place where some act was clearly committed may not be suitable for accurate factfinding. This question is not explained, by the way, by any differences which may exist in the elements of racketeering crimes (which were the subject of some of these cases) and the elements of non-racketeering conspiracies.

The logical basis of a difference is that the Court and the trial jury have somewhat different functions with respect to making findings as to venue. The Court applies tests designed to protect the fairness of the proceedings, and the jury applies tests designed to address the credibility and weight of the evidence. Although the word "substantial" is not discussed in these cases in terms of the sufficiency of the contact between some element of the charged crime and the district of trial, normal understanding of the meaning of the word suggests that it is not synonymous with "any act in furtherance", which may or may not be substantial. The Court, as gate-keeper at the point where a Rule 29 motion is made at the close of the government's case, has a duty to determine whether the facts show that some "substantial" act was taken in furtherance of the conspiracy such as to make trial in this district for crimes mostly committed elsewhere meet the Constitutional test of venue.

In this case, there was no testimony or evidence as to the route the car took from Florida to "New York." It is just as logical for the driver to have chosen to cross Staten Island from New Jersey into Brooklyn, by-passing Manhattan, as to assume he drove through Manhattan. The

evidence that the car was parked "in Manhattan" after Mr. Montgomery brought it to "New

York" is so sketchy as to not be reliable: it was controverted by the defendant, whose testimony

on this point was completely logical (since he lived in Brooklyn) unless the car, having already

been delivered to Bennett by Mr. Montgomery was parked in Manhattan at a later point –  there

was no logical reason for the car to have been parked in Manhattan by Mr. Montgomery after the

defendant drove all the way from Florida and had to go on to any of several residences he had in

Brooklyn before being able to go to sleep. There was no corroboration of the "Manhattan"

statement, and no other event or purpose to include Manhattan in any part of the plan, which was

to resell the car in Queens (Hillside Avenue). Finally, the plan was actually completed when the

car crossed the Florida State line.

Assuming, despite the above, that the car was parked in Manhattan for some unspecified

period of time before it was delivered to Toybe Bennett, at an unspecified location (as far as the

Government's case is concerned) so that he could sell it to a dealer on Hillside Avenue (in the

Eastern District), the transitory passage through Manhattan is hardly a substantial contact. Count

15 should be dismissed.

POINT II

NO EVIDENCE WAS PRESENTED BY THE GOVERNMENT
THAT SHOWED, EVEN CIRCUMSTANTIALLY, THAT THE
DEFENDANT HAD KNOWLEDGE THAT THE METHOD OF
STEALING THE CARS AS ALLEGED IN THE INDICTMENT
WAS TO PURCHASE THE CARS WITH A COUNTERFEIT
CHECK.

Although the crime charged in Count 15 can involve various forms of theft and

conversion of property, the indictment in this case was very specific as to the form the theft is

alleged to have taken, to wit: "TOYBE BENNETT, ROBERTO MONTGOMERY, and others used a counterfeit check to purchase at least approximately three vehicles in Florida, which the conspirators subsequently transported or caused to be transported to New York..."

No motion was made before or during the trial to amend the pleadings to conform to the proof.

The charge in the indictment clearly relates only to the attempted purchase of the initial three cars during November, 2004. Although Gene Morales testified that he was presented with two additional checks for the purchase of several other vehicles in the future, the indictment does not allege that this was an object or part of the conspiracy, since although the indictment says "at least three cars" the later cars were in no way transported or caused to be transported to New York or any other place. To the extent that the government may rely, or did rely, on this evidence to expand the scope of the conspiracy as charged in the indictment, the defense contends that this would constitute a constructive amendment of the indictment. An indictment has been constructively amended "[w]hen the trial evidence or the jury charge operates to 'broaden[] the possible bases for conviction from that which appeared in the indictment.'" United States v. Milstein, 401 F.3d 53, 65 (2d Cir. 2005) (second alteration in original) (quoting United States v. Miller, 471 F.3d 130, 138 (1985)); see also, United States v. Kaplan,    F.3d   , No. 05-5531-cr, 2007 U.S. App. LEXIS 8363, 2007 WL 1087270, at *16 (2d Cir. Apr. 11, 2007). Constructive amendment is a per se violation of the Grand Jury clause of the Fifth Amendment requiring reversal. United States v. Roshko, 969 F.2d 1, 5 (2d Cir. 1992) (explaining that, where constructive amendment "affects an essential element of the offense," it "destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment returned by a

-10-

grand jury" (alteration in original) (internal quotation marks omitted)); *see also* <u>Milstein</u>, 401 F.3d at 65.

Moreover, alleging that the conspiratorial plan involved theft by any broader or alternative means of stealing the cars by paying for them with a counterfeit check would be a variance from the indictment. A variance occurs when the charging terms remain unaltered but the facts proven at trial differ from those alleged in the indictment. See <u>United States v. Dupre</u>, 462 F.3d 131, 140 (2d Cir. 2006).

The proof at trial failed to establish that the defendant could have known that a counterfeit check was used to purchase the vehicles. The timing of Mr. Montgomery's involvement, as stated in the testimony of Natasha Singh as part of the government's case, is crucial: the plan was hatched by Toybe Bennett and Douglas Shyne, the purchases were made by telephone by the two of them – Roberto Montgomery was not present – and the payment was sent by Federal Express on November 17, 2004 by someone other than Roberto Montgomery.

Natasha Singh testified that Roberto Montgomery was brought into the plan when someone was needed to pick up one of the cars when the truck "broke down," and Gene Morales said that the necessity for someone to pick up the car only occurred after he was ready to ship the cars, after the check cleared which took ten days, and there was insufficient room on the truck for one of the cars. Singh, at T. 285, Morales, at T. 1502-1503. Thus, there is no evidence that Mr. Montgomery knew anything about the method of payment for the cars at the time payment was made. Moreover, none of the testimony of Natasha Singh about how the checks were counterfeited and who it was done by ever involved any events at which Roberto Montgomery was present, nor did she claim that she or any other co-conspirator told Roberto Montgomery that

-11-

counterfeit checks were being used to purchase the cars (or for anything else). T. 194-210.

None of the evidence presented by Gene Morales contained any reference to how the first three cars were paid for: there was no discussion of a check, much less any discussion of the check being counterfeit. At most, one might deduce that the checks Morales claimed were handed to him by Mr. Montgomery, supposedly for future deals, which were counterfeit, might show some knowledge that counterfeit checks were being used to purchase cars, but they do not relate to the cars alleged in the indictment (as already argued) and there is no evidence that they were seen by Mr. Montgomery since they were handed over in an envelope from which Morales removed them and gave them to his staff person to deposit. T. 1517[5], 1557. Mr. Morales said that he did not discuss the checks with Mr. Montgomery. T. 1561. Even if Mr. Montgomery saw these checks, there was nothing on the face of them to make someone know they were counterfeit, which itself would only be probative, if at all, of the fact that any earlier check used to buy the critical three cars was also counterfeit. None of the other checks which Mr. Montgomery might have seen – for example the $18,000 Riddick check, or the two tax-refund checks, was itself counterfeit, and therefore these could not be the basis of a circumstantial inference that Mr. Montgomery was aware in some general way that counterfeit checks were being used by Toybe Bennett and others to purchase cars in Florida. Indeed, even if he knew that Bennett, Shyne, and others were making money through the use of counterfeit checks, nothing showed that he knew that the purchase of cars was not just "use of the profits" of those schemes (as, for example, when some co-conspirators purchased jewelry and clothing, and even cars, with

---

[5]"He [Montgomery] had brought me an envelope from Dimitry on the next group of cars..."

legitimate forms of payment but profits of these schemes, which might be money-laundering but would not be sufficient to meet the charge in this count of the indictment).

Conscious avoidance does not support this claim either. Since the indictment is quite specific in saying that the check used was "counterfeit" and not stolen, or the proceeds of some other fraudulent activity, one's "knowledge" that there might be "something wrong" with a check is not sufficient to bring the proof of knowledge into conformity with the charge in the indictment. The "use of the profits" possibility also eliminates conscious avoidance as a route to proving knowledge that the cars were being purchased with a counterfeit check.

The proof of the knowledge element of count 15 was simply not sufficient to establish the crime as charged in the indictment, and the charge should be dismissed.

POINT III

THIS COURT SHOULD FIND THAT THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW ON EITHER VENUE OR KNOWLEDGE BY FINDING THAT THE EVIDENCE PRESENTED IN THE GOVERNMENT'S CASE WAS INSUFFICIENT, AND GRANT THE MOTION MADE AT THE CLOSE OF THE GOVERNMENT'S CASE, ON WHICH DECISION WAS RESERVED.

Although the Court is permitted to reserve decision on the motion made pursuant to Rule 29(a), the legal question and the standards to be applied to that reserved decision have not changed either as a result of the presentation of evidence by the defendant or by the verdict rendered by the jury. Although we do move, in the alternative, for a dismissal of the count pursuant to Rule 29(c), we do this as an alternative and only in the event that the Court finds that

-13-

the evidence under the Rule 29(a) standard was, in fact, sufficient.[6] The practical difference to the defendant is, of course, finality of the result. In theory he should not have been made to continue to defend against this charge if the evidence at the close of the government's case was insufficient, and unless the Court can truly say that the evidence of both venue and knowledge was sufficient as presented in the government's case, the defendant deserves a judgment of acquittal.

CONCLUSION

This Court, either as a matter of making a final decision on the reserved Rule 29(a) motion, or, in the alternative, as a matter of post-verdict review of the sufficiency of the evidence pursuant to Rule 29(c), should dismiss Count 15 of the indictment.

Dated: New York, New York
       June 11, 2007

                              Respectfully submitted,


                               /s/ Thomas H. Nooter
                              THOMAS H. NOOTER
                              Attorney for Defendant

---

[6]There is some contradictory caselaw from various Circuits suggesting that the trial court can reserve, pursuant to Rule 29(b), decision on the motion made at the close of ALL of the evidence, but not the motion made at the close of the government's case, since some courts have held that for the defense to proceed to present a defense after a denial of the Rule 29 motion made at the close of the government's case, there is a waiver of that denial. We do not challenge the correctness of the Court's reservation of decision on the motion made at the close of the government case, but do contend that the evidence has to be reviewed as if no other later evidence had been presented (with respect to the Rule 29(a) motion only. See United States v. Wahl, 351 U.S. App. D.C. 284, 290 F.3d 370, 374-375 (D.C. Cir. 2002): " We recognize Rule 29(b)'s instruction that any ruling must be decided on the basis of the evidence presented at the time the ruling was reserved. The district court in this case reserved Wahl's motion at the close of the government's case. Any ruling on that motion, then, should have been made solely on the evidence offered by the government."

-14-

<u>AFFIRMATION OF SERVICE BY ECF AND MAIL</u>

      THOMAS H. NOOTER, ESQ., being an attorney duly admitted to the practice of law, declares under penalties of perjury and pursuant to 28 U.S.C. § 1765 that the following is true:

      I am over the age of 18 years, and I am not a party to the within action.

      On June 11, 2007, I filed the annexed motion by using the ECF system of the United States Court for the Southern District of New York, and in addition, mailed a true copy of the to the Office of the United States Attorney for the Southern District of New York by placing the same in a clearly marked envelope addressed to Danya Perry, Esq. and Daniel Levy,  the Assistants to the United States Attorney handling this case, 1 St. Andrew's Plaza, New York, New York, 10007 and sending it by United States Mail

Dated: New York, New York
       June 11, 2007

                                    */s/ Thomas H. Nooter*
                                     THOMAS H. NOOTER