UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :
      :
   -v.-      :     S4 05 Cr. 1067 (KMK)
      :
ROBERTO MONTGOMERY,      :
NARESH PITAMBAR,      :
STEVEN RIDDICK, and      :
NATHANIEL ALEXANDER,      :
      :
     Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS

MICHAEL J. GARCIA
United States Attorney for the Southern
District of New York

E. DANYA PERRY
DANIEL W. LEVY
Assistant United States Attorneys
    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :
                                  :
       -v.-                       :         S4 05 Cr. 1067 (KMK)
                                  :
ROBERTO MONTGOMERY,               :
NARESH PITAMBAR,                  :
STEVEN RIDDICK, and               :
NATHANIEL ALEXANDER,              :
                                  :
                    Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       The Government respectfully submits this Memorandum of Law in opposition to the Rule

29 motions filed by defendants Roberto Montgomery ("Montgomery") and Naresh Pitambar

("Pitambar").[1]  For the reasons set forth below, the defendants' post-trial motions should be

denied.

## I.     <u>Legal Standard</u>

       A defendant making an insufficiency claim on a motion for a judgment of acquittal

pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure "bears a very heavy burden."

<u>United States v. Desena</u>, 287 F.3d 170, 177 (2d Cir. 2002); <u>United States v. Macklin</u>, 927 F.2d

1272, 1277 (2d Cir. 1991).  A jury verdict must be upheld if "'<u>any</u> rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt.'" <u>United States v.</u>

<u>Autuori</u>, 212 F.3d 105, 114 (2d Cir. 2000) (emphasis added and quoting <u>Jackson v. Virginia</u>, 443

U.S. 307, 319 (1979)); <u>accord</u> <u>United States v. Reyes</u>, 302 F.3d 48, 52 (2d Cir. 2002).  In a close

case, . . . the court must let the jury decide the matter.'" <u>United States v. Autuori</u>, 212 F.3d at

_____

       [1] Defendant Steven Riddick filed a cursory one-page post-trial motion dated June 11,
2007.  Because this Court already has denied that motion by Order dated June 12, 2007, the
Government does not respond to Riddick's motion.  Defendant Nathaniel Alexander did not file
a post-trial motion.

114 (quoting <u>United States v. Guadagna</u>, 183 F.3d 122, 129 (2d Cir. 1999)) (internal quotation marks and brackets omitted).

In the case of a challenge to the sufficiency of the evidence of venue, the question presented to the trial court is whether any rational jury could have found venue by a preponderance of the evidence.  <u>See</u>, <u>e.g.</u>, <u>United States v. Chen</u>, 378 F.3d 151, 159 (2d Cir. 2004); <u>United States v. Speed</u>, No. 04 Cr. 336, 2006 WL 196971, *2 (S.D.N.Y. Jan. 26, 2006); <u>United States v. DeFreitas</u>, 92 F. Supp. 2d 272, 276 (S.D.N.Y. 2000).  As to the elements of an offense, the question is whether any rational jury could have found the elements beyond a reasonable doubt.

In considering the sufficiency of the evidence, a court must "view[ ] all of the evidence in the light most favorable to the government."  <u>United States v. Aleskerova</u>, 300 F.3d 286, 292 (2d Cir. 2002); <u>see also</u> <u>United States v. Reyes</u>, 302 F.3d at 52.  The Court must analyze the pieces of evidence "not in isolation but in conjunction," <u>United States v. Matthews</u>, 20 F.3d 538, 548 (2d Cir. 1994); <u>see</u> <u>Autuori</u>, 212 F.3d at 114, and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," <u>United States v. Guadagna</u>, 183 F.3d 122, 130 (2d Cir. 1999); <u>see</u> <u>Reyes</u>, 302 F.3d at 53 ("we consider the evidence as a whole"); <u>id.</u> at 57.

"'[T]o avoid usurping the role of the jury,'" <u>Autuori</u>, 212 F.3d at 114 (quoting <u>Guadagna</u>, 183 F.3d at 129), the court must "'resolve all issues of credibility in favor of the jury's verdict,'" <u>United States v. Desena</u>, 287 F.3d at 177 (quoting <u>United States v. Desena</u>, 260 F.3d at 154). "[T]he credibility of witnesses is the province of the jury, and [the court] simply cannot replace the jury's credibility determinations with [its] own."  <u>United States v. James</u>, 239 F.3d 120, 124

2

(2d Cir. 2000); see Autuori, 212 F.3d at 114 (court "may not substitute [its] own determinations

of credibility or relative weight of the evidence for that of the jury"); Guadagna, 183 F.3d at 129.

Moreover, the court must "credit[ ] every inference that the jury might have drawn in favor of the

government," United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998), because "the task of

choosing among competing, permissible inferences is for the [jury], not for the reviewing court,"

United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001); United States v. Martinez, 54

F.3d 1040, 1043 (2d Cir. 1995).

     The general rule about resolving credibility determinations in favor of the Government

means that, in considering the sufficiency of a conviction based in any part on cooperator

testimony, a court must credit the testimony of cooperating witnesses.  United States v. Glenn,

312 F.3d 58, 64 (2d Cir. 2002); United States v. Taylor, 92 F.3d 1313, 1333 (2d Cir. 1996)

("Although [appellant] complains that the bulk of this testimony came from cooperating

witnesses, we must defer to the jury's resolution of any questions as to the credibility of

witnesses.").

     "[T]he jury's verdict may be based entirely on circumstantial evidence."  United States v.

Martinez, 54 F.3d at 1043; United States v. Sureff, 15 F.3d 225, 228 (2d Cir. 1994).  Because the

jury is entitled to choose which inferences to draw, the Government, in presenting a case based

on circumstantial evidence, "need not 'exclude every reasonable hypothesis other than that of

guilt.'"  Guadagna, 183 F.3d at 130 (quoting Holland v. United States, 348 U.S. 121, 139

(1954)); Reyes, 302 F.3d at 56 (by "discount[ing] evidence of guilty knowledge entirely because

there were possible . . . innocent explanations for [defendant's] conduct," district court "failed to

view the evidence in the light most favorable to the government"); Autuori, 212 F.3d at 114 ("the

government need not negate every theory of innocence"); see also Jackson, 443 U.S. at 326 (rejecting argument "that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt").

In this case, Montgomery and Pitambar made motions for a judgment of acquittal at the close of the Government's case-in-chief and the Court reserved decision on these motions, as permitted under Rule 29(a). See Trial Transcript ("Tr.") 2159-60, 2162-63. At the close of the defense case, all defense motions under Rule 29 were renewed and the Court again reserved decision as to Montgomery and Pitambar's motions. Tr. 3119. Because the Court reserved its decision at the close of the Government's case-in-chief and the motion was renewed, the Court should, in deciding Montgomery and Pitambar's motions now, confine itself to reviewing the evidence admitted at the time of the motion, i.e., at the close of the Government's case. See Fed. R. Cr. P. 29, Advisory Comm. Notes, 1994 Amendments (where trial court grants motion for judgment of acquittal made at close of Government's case, trial court should consider "only the evidence submitted at the time of the motion"); see, e.g., United States v. Velasquez, 271 F.3d 364, 371-72 (2d Cir. 2001) (distinguishing circumstance where trial court denies Rule 29 motion made after Government rests from circumstance where trial court reserves decision on Rule 29 motion made after Government rests).

## II.    The Evidence Was Sufficient To Convict Pitambar Of Bank Fraud Conspiracy.

The evidence at trial amply established that Naresh Pitambar conspired to commit bank fraud, by agreeing with his friend and relative, Christine Richardson, to deposit the proceeds of a counterfeit check into his business bank account and then to funnel back certain of those proceeds to the originators of that check, minus his commission.

4

A.      **The Evidence At Trial Against Pitambar**

The evidence established that Douglas Shyne ("Shyne"), assisted by others, including his girlfriend Natasha Singh ("Singh") and his friend Toybe Bennett, a/k/a "Dmitri Makarevich" ("Bennett"), was in the business of procuring millions of dollars in fraudulent checks.  Certain of the counterfeit checks used in the conspiracy were manufactured with the assistance of bank insiders who had access to the bank account and personal information of bank customers; others were manufactured from legitimately obtained checks.  See, e.g., Tr. 189, 194-200.  Shyne and Singh would then frequently arrange for the fraudulently obtained checks to be deposited into the bank accounts of their friends, relatives, and associates, who would then, in turn, funnel proceeds of such checks back to them, minus a commission.  See, e.g., Tr. 204.  Shyne typically would agree with the depositing co-conspirator "to give them a fee for taking the chance to put the money in their account."  Tr. 220.  As noted, proceeds of the fraud were often funneled through the accounts of relatives, such as Bennett's cousin and Montgomery's sister (Cynthia Montgomery), Singh's brother (Ephraim Richardson), Singh's mother (Christine Richardson), and Shyne's brother (Nathaniel Shyne); in turn, these individuals would keep a commission for themselves and transfer the balance of the proceeds to Shyne and Singh.  See, e.g., Tr. 220-222, 241-43, 253-59, 409-10.  According to Singh, on every occasion in which Shyne used another individual's pre-existing account in order to deposit such proceeds, he did so with their agreement.  Tr. 544.  Shyne made it a point to have the agreement of these co-conspirators because "[h]e wanted to be sure that . . . he gets the money from their accounts, he has some kind of control over what is going on in their account, that he doesn't get burned."  Tr. 546; see also Tr. 594-95.

In the part of the scheme as it related to the trial defendants, Shyne arranged with his friend Anthony Prince ("Prince") for the transfer of numerous counterfeit checks from Shyne in the New York area to Prince in the Norfolk, Virginia area. See, e.g., Tr. 226 et seq. According to their arrangement, these checks were then transferred to Tim Montgomery (an acquaintance of Prince's), Steven Riddick (Tim Montgomery's coach), and Nathaniel Alexander (Riddick's officemate) for deposit into accounts controlled by them. One of the checks sent to Virginia in this manner was deposited into the bank account for Riddick's business, Steve Riddick Sports Training, and the proceeds were sent back in the form of checks written off that account: these checks were signed by Riddick and the amounts were filled in, but the payee sections were left blank. Among the ultimate recipients of these Steve Riddick Sports Training checks were Montgomery, who received a check for $18,000, and Pitambar, who received a check for $20,000.

In a search of Shyne and Singh's home, agents recovered, among many other items, a business card with the name Naresh Pitambar written on the back. Pitambar was a friend and relative of Singh's mother, Christine Richardson. Tr. 262. As noted, one of the partially blank checks Shyne and Singh received from Riddick was a check for $20,000, onto which Singh typed the name of Pitambar's business, Joe's Construction. Tr. 264. After depositing the check into his account, Pitambar signed a $10,000 check (without filling in the payee), which he then transferred to Christine Richardson, who in turn transferred it to Shyne and Singh. Singh then made Pitambar's check out to Amechi Fence, a construction company building a fence for the residence owned by Shyne and Singh. Tr. 266-67.

The arrangement with Pitambar was that the balance of the money owed by Pitambar

6

would be paid out in cash. Tr. 268. Shyne initially received this money (over $6,000) by automatically withdrawing it from Pitambar's account for payment on a car loan. Tr. 268-69. In order to do this, Shyne "[c]alled up the car note place and say I want to make a payment by phone and he would give the checking account and routing and the information they need." Tr. 269. Pitambar later "changed [his] mind," Tr. 270, and challenged and reversed the withdrawals from his bank account. After this, Richardson had a conversation with Pitambar, in which she asked Pitambar "why you try to smart people like that, you never mentioned anything if you changed your mind and taking the money out and like that, and now they need their money, the man is upset he needs his money." Tr. 270. Pitambar and Richardson then had a conversation "about Joe [Pitambar] doing another check," and Richardson reasoned with Pitambar that "how would you want to do another check with the people if you are not giving them the money that is due to them." Id.. The "end result of that conversation" was that Pitambar brought Richardson a bank check and the cash resulting from that check was transferred to Shyne and Singh. Id.

At the time of the above-described conduct, Pitambar discussed with Richardson the false excuse he would use "should the check come back as a bad check." Tr. 271. To that end, they concocted the fabrication that "if the check comes back [] they were going to say that [Pitambar] did some [construction] work for [Richardson] for her to get that check." Tr. 271. In his post-arrest statement, Pitambar admitted that Richardson had fed him this false "scenario" to use "if he was asked by anyone" about the provenance of the check. Tr. 1657. And indeed, this excuse was the very false exculpatory Pitambar initially provided to Special Agent Rosenblatt after his arrest. Tr. 1734-37.

Initially upon his arrest, Pitambar lied to Special Agent Rosenblatt about his involvement

in the conduct charged in the Indictment.  Specifically, he informed Special Agent Rosenblatt that he owned a business called Joe's Construction, "which did renovations, bathrooms and kitchens."  Tr. 1734.  Pitambar stated that his relative, Christine Richardson, had called and "asked him if he would be interested in doing some work on her [] rented apartment, doing some refurbishment on the kitchen and bathroom and he agreed he would . . ."  Id.  Pitambar stated that after he inspected Richardson's apartment -- which he knew to be a rental -- he gave her an estimate of $20,000 for the work, to which she agreed.  Tr. 1734-35.  Pitambar told Special Agent Rosenblatt that Richardson then came to his house and hand-delivered a check made out to Joe's Construction, which he then deposited into his business account at Citibank.  Tr. 1735. Pitambar stated that a few days later, Richardson informed him that she had changed her mind and wanted a refund, in the form of two checks -- one for $10,000 made out to her personally and another for $10,000, with the payee left blank.  Id.  Pitambar stated that he was going to wait until the check cleared and would then do as Richardson had requested.  Id.  He did indeed sign an otherwise blank check and give it to Richardson.  However, according to Pitambar's statement to Special Agent Rosenblatt, upon "reviewing his bank statements," he "found that there were two wire transfers out of his Joe's Construction account to Chrysler Financial totaling approximately $6,400."  Tr. 1736.  He then "asked Citibank to recall the wire transfers because he wasn't aware that money was going to be taken directly out of his account."  Id.  He stated that "Ms. Richardson called soon after and [] wanted to know why he returned the wire transfers."  Id. Pitambar stated that Richardson instructed him instead that "a blank check be written out to her for $10,000," and he also agreed to "provide her a check for the balance of $6,400 off of the account."  Id.  According to Pitambar's statement to Special Agent Rosenblatt, although initially

Pitambar was not going to charge Richardson an estimate fee, "because he was upset by the situation he was going to charge her $2,000 for the estimate, which also [] . . . included bank fees associated with the wire transfer." Tr. 1737. Special Agent Rosenblatt's portion of the interview then concluded. Id.

Special Agent Clinton Ilges and Task Force Officer Joel Washington then continued interviewing Pitambar. Tr. 1654, 1738. At that point, Pitambar admitted that the statements he had made to Special Agent Rosenblatt "weren't exactly correct." Tr. 1655. Instead, Pitambar told Special Agent Ilges that Richardson had called him and then stopped by his house to request that he do her a "favor"; specifically, "she asked him if he would deposit a check in the amount of $20,000 into his business account." Id. Pitambar agreed, and told Special Agent Ilges that "[w]hen she presented the check, he asked her if the check was good and she stated yes." Tr. 1656. Pitambar then admitted the falsity of his initial explanation that the check was for a construction job in Richardson's apartment, and explained that this was a false "scenario that was told to him by Richardson if he was asked by anyone to say that [] she had given him the $20,000 to fix up her apartment." Tr. 1657.

Pitambar also told Special Agent Ilges that of the $20,000 he deposited into his account, "he was going to be able to keep $3,000 of that." Tr. 1657-58. He further stated that "when Christine Richardson initially came to him with this proposal," he had "discussed it with his wife" and "she didn't want him to do it." Tr. 1658. However, he stated that he "was going to try to help his family out." Id.

Pitambar told Special Agent Ilges that when he received the check, he "was instructed by Richardson to deposit the check into his business account to wait for the check to clear and then

to get back in contact with her." Tr. 1658.  Pitambar further stated that after the check cleared,

Richardson stopped by his residence and asked Pitambar to write two checks, "[t]he first of

which was for $10,000 was supposed to be made out blank and the second of which was for

$6,400 that was to be made out to her." Tr. 1659.  Later on, "he noticed there was a wire transfer

out of his accounts for the same amount [$6,400] and he contacted the bank because he didn't

authorize a wire transfer for $6,400" to Chrysler Financial.  Id.  He then requested that the bank

stop payment on this wire transfer, because "[h]e believed that it was Richardson who had

initiated [the] transfer and he wanted the canceled check back from that as proof." Tr. 1660.

After he stopped payment on the wire transfer, "Richardson [] contacted him from Florida by

phone because she had since moved there and questioned him as to why he stopped payment on

the [] . . . wire because she needed to pay people." Id.

After Richardson complained about the wire reversal, Pitambar "was instructed by

Richardson at the time to send [her] another check for $6,400," and in fact he stated that he did

write her a check for that amount, which he personally deposited into her bank account.  Tr.

1661-62.  At the conclusion of the interview, Pitambar stated that "he was sorry for lying to

Special Agent Rosenblatt and that he was just trying to help his family and he didn't want to get

in trouble." Tr. 1662.

## B.    Discussion

Pitambar argues that the Government failed to prove that "an illegal agreement existed

between Pitambar and Richardson, and Pitambar knowingly and willingly participated therein."

Pitambar Memorandum of Law in Support of Motion to Dismiss Pursuant to Rule 29 at 6 (dated

June 11, 2007) (hereinafter "Pitambar Memo").  Pitambar is wrong.  The Government presented

more than sufficient evidence by which a rational jury could conclude that each of the elements of the bank fraud conspiracy charge was satisfied.

To begin, as conceded by Pitambar himself, the circumstances surrounding his conduct were "suspicious" indeed. <u>See</u> Pitambar Memo at 6. Pitambar accepted and deposited a check for $20,000 made out to his Queens-based construction company from a sports training company in Virginia with whom he did no business and who owed him and his company no money. He received this check from Richardson, a sometime babysitter, who also could have had no legitimate claim to this money, and who -- despite having a bank account -- was unwilling to deposit it into her own account.[2] Pitambar then signed an otherwise blank check and gave it to Richardson. For this service, Pitambar understood that "he was going to be able to keep $3,000 of that," Tr. 1657-58 -- a significant amount to an individual who had been overdrawn on his account prior to this deposit. <u>See</u> GX 18D.

The overlay atop this patently "suspicious" conduct is the testimony in the case further establishing that Pitambar knowingly and willingly participated in an unlawful agreement to commit bank fraud. Pitambar admitted that "when Christine Richardson initially came to him with this proposal," he had "discussed it with his wife" and "she didn't want him to do it." Tr. 1658. However, he nevertheless agreed to go along with it. According to Pitambar's post-arrest statement, Richardson had assured him that the $20,000 check was not itself a "bad" check; in

---

[2] Pitambar was aware, at least at some point during the life of the conspiracy, that Richardson had her own bank account, because he himself deposited a bank check into her account. Tr. 1662.

other words, it was not itself stolen, altered, or counterfeit.[3]  However, the evidence established

that Pitambar was aware that the check came from an illegitimate source, representing the

proceeds of a fraud.  Pitambar in fact had discussed with Richardson the false excuse he would

use "should the check come back as a <u>bad check</u>."  Tr. 271 (emphasis added).  And indeed, the

excuse he concocted with Richardson -- that "if the check comes back [] they were going to say

that [Pitambar] did some [construction] work for [Richardson] for her to get that check," Tr. 271[4]

-- was the very same excuse he initially provided to Special Agent Rosenblatt upon his arrest.

Tr. 1734-37.  He only would have concocted a false story at the time of the conduct because he

knew at the time that his conduct was illicit.

The evidence further established that Pitambar was aware that he was operating within a

larger conspiracy involved with checks and, indeed, further established that Pitambar himself was

motivated by an interest to "do" at least one additional check with this group.  Although Pitambar

initially had agreed to allow the transfer of funds from his Citibank account, he later changed his

mind and reversed that transfer.  Tr. 270.  This reversal prompted a dressing-down from

Richardson, who scolded Pitambar for "try[ing] to smart people like that" by changing his mind

and reversing the withdrawal, because "now they need their money, the man is upset he needs his

---

[3] The jury understood that the conspirators in the case understood checks representing proceeds of "bad" checks to themselves be technically "good" checks -- even though depositing such proceeds was of course unlawful.  <u>See</u>, <u>e.g.</u>, Tr. 509, 511, 514-15 (testimony of Singh); Tr. 744 (testimony of Jeffrey Blue that, in providing to Blue a check representing proceeds of a counterfeit check, Prince informed Blue that "[t]his one should be good.").

[4] It is noteworthy that Pitambar himself supported Singh's testimony in this regard: in his post-arrest statement to Special Agent Ilges, Pitambar acknowledged that the false story he gave to Special Agent Rosenblatt was a "scenario that was told to him by Richardson if he was asked by anyone to say that [] she had given him the $20,000 to fix up her apartment."  Tr. 1657.

money." Tr. 270. Pitambar and Richardson then had a conversation "about Joe [Pitambar] doing

another check," and Richardson reasoned with Pitambar that "the people" would be unwilling

"to do another check" unless Pitambar paid them their share of the proceeds. Id. ("how would

you want to do another check with the people if you are not giving them the money that is due to

them.").[5] Clearly, Pitambar did indeed "want to do another check with the people," and he was

convinced by this logic: the "end result of that conversation" was that Pitambar provided a bank

check to Richardson, who in turn transferred the funds to Shyne and Singh. Id. Thus, Pitambar

was aware that others were involved who also were partaking in the proceeds of the check; he

had expressed an interest in "doing" more such checks with these "people"; and indeed he was

motivated by this interest to pay up the money that was due to these people. Even by his own

admission, Pitambar was aware that Richardson was going to use proceeds of the check to pay

other people. Tr. 1660.

　　　All of the above is properly viewed within the context of the testimony regarding the

typical practices of the conspirators. Singh testified that on every occasion in which Shyne used

---

　　　[5] In a footnote, Pitambar argues that "it is entirely unclear if Richardson had this
conversation with Shyne, not Pitambar." Pitambar Memo at 3, n.2. There is no ambiguity in the
record: this portion of Singh's testimony is excerpted from a larger discussion about
Richardson's "conversation with Joe," in which she asked him why he had reversed the Citibank
withdrawal. Tr. 270 (emphasis added). While still describing this single discussion between
Richardson and Pitambar, Singh goes on to state "[a]nd then there was conversation about he
[sic] doing another check, mom was talking to him about making decision about doing another
check, she said to him . . . she said to me she told him how would you want to do another check
with the people if you are not giving them the money that is due to them." Id. The "end result"
of "that conversation" -- again, the only "conversation" being the one Richardson had "with Joe"
-- is that "he brought her a bank check and she deposited and that is how she got the cash to bring
to us." Id. It is hard even to understand how Pitambar could be suggesting that Richardson
might have been asking Shyne "how you want to do another check with the people if you are not
giving the money that is due to them." Id. Such a suggestion makes no sense.

another individual's pre-existing account in order to deposit a check, he did so with their agreement. Tr. 544. As part of that agreement, Shyne would get the co-conspirator's bank account information and personal identification number ("PIN") "to make sure they're not ripping him off like the money cleared and they said the money didn't clear." Id. Shyne was sure to have the agreement of these co-conspirators because "[h]e wanted to be sure that . . . he gets the money from their accounts, he has some kind of control over what is going on in their account, that he doesn't get burned." Tr. 546; see also Tr. 594-95. Not only does this practice of explicit agreement with the depositing parties make good common sense, but it is consistent with the evidence at trial regarding the practices of the conspirators. For example, evidence was presented of other instances in which the depositing individuals -- including Jeffrey Blue and Charles Wells -- were well aware that the checks they were depositing were either fraudulently obtained checks or proceeds of such checks.

Pitambar relies primarily upon United States v. Rodriguez, 140 F.3d 163 (2d Cir. 1998), in support of his argument that the evidence failed to establish Pitambar's guilt. In light of the foregoing proof presented at trial, the holding in Rodriguez has no application to this case. There, in a critical distinction, the defrauded entity was a publishing company; here, the defrauded entity was a federally insured bank, Wachovia Bank -- which in fact suffered a substantial actual loss as a result of the conduct of Pitambar and his co-conspirators. See Tr. 608-09. Additionally, Rodriguez involved a conviction for substantive bank fraud; in this case, Pitambar was convicted of conspiracy to commit same. Thus, all that is necessary is that his co-conspirators were aware that a bank that was, in fact, federally insured was subjected to an actual or potential loss. That Pitambar may not have been aware which bank was victimized is of no

moment, as he was convicted of conspiracy, and there is and can be no argument that his co-conspirators were unaware.[6]  That has been amply proven in this case.

Pitambar also discounts the evidentiary impact of the false exculpatory he initially provided to law enforcement agents upon his arrest, arguing that, under United States v. Nusraty, 867 F.2d 759, 765 (2d Cir. 1989), and United States v. Samaria, 239 F.3d 228, 236 (2d Cir. 2001), "falsehoods told by a defendant to law enforcement is not enough to convict where other evidence of guilt is weak."  Pitambar Memo at 7.

To begin, the Government presented ample additional evidence of Pitambar's guilt, as set forth above, and it certainly did not rely exclusively on his false statements.  As a matter of law, false exculpatory statements made to law enforcement officials are circumstantial evidence and have independent probative force.  United States v. Strother, 49 F.3d 869, 877 (2d Cir. 1995).  In Nusraty and Samaria, the evidence presented at trial "amounted to little more than the defendant's false exculpatory statement upon arrest and his mere presence on one or two occasions."  United States v. Aleskerova, 300 F.3d 286, 294 (2d Cir. 2002).  By contrast, the proof in this case consisted of a great deal more than mere presence combined with a false exculpatory, including: the highly suspicious circumstances surrounding the check and Pitambar's pocketing of a $3,000 commission for depositing a $20,000 check; Pitambar's contemporaneous invention of a false excuse should the check come back as bad; and his discussion with Richardson about "do[ing]" another check with the originator of the check.

Additionally, Pitambar's false exculpatory is evidence of more than just consciousness of

---

[6] As the Court charged the jury -- properly and without objection -- "a defendant need not have been fully informed as to all the details or the scope of the conspiracy in order to justify an inference of knowledge on his part."  Tr. 3355.

guilt.  Unlike in the cases cited by the defendant, in this case, his false statements are not just proof that he recognized at time of arrest that he had been involved in criminal conduct.  Far from it: his false exculpatory is particularly damning because he concocted it, along with his co-conspirators, at the time of the original criminal conduct.  The excuse was prospectively cooked up during the life of the conspiracy in case "should the check come back as a bad check."  Tr. 271; see also Tr. 1657.  In other words, the fact that Pitambar devised this false excuse at the time of the conduct is evidence that he knew at the time that he was involved in criminal conduct.

Lastly, Pitambar argues that the Government failed to establish venue.  Pitambar Memo at 7.  The argument boils down to the claim that "it is ridiculous that the government's clings to venue on one check given to Jason Watler."  Pitambar Memo at 8.  Contrary to Pitambar's one-sentence assertion that venue has not been satisfied, the Government proved substantial contacts with the Southern District of New York.  As conceded by Pitambar, Jason Watler, a co-conspirator, deposited at a Citibank branch in Manhattan a check representing part of the proceeds of the same counterfeit check as the money received by Pitambar.  GX 20A, 50; Tr. 2146-47.  Moreover, not only was a check deposited in this District, but Pitambar ignores that the $375,000 counterfeit check deposited into Steven Riddick's bank account was sent from Manhattan, GX 11; see also Tr. 2119-20, and Pitambar's $20,000 check was proceeds of this check.  The conduct that occurred in the Southern District of New York, for sure, satisfies the "substantial contacts" test, described more fully below.  See Part II.A.1, infra.  Accordingly, Pitambar's venue argument is frivolous and should be rejected.

**III.    The Evidence Was Sufficient To Convict
        Montgomery Of The Stolen Goods Conspiracy.**

Montgomery argues that the evidence of venue on the count of the Indictment charging a conspiracy to violate 18 U.S.C. § 2315 was insufficient and that the evidence was insufficient to establish that he was aware that the check with which the goods in question were purchased was counterfeit.  Both arguments are meritless and should fail.

**A.    The Government Sufficiently Established Venue.**

With respect to Montgomery's venue argument, it is clear that a rational jury could have found venue by a preponderance of the evidence.  At least two facts make inexorable the determination that the Government sufficiently proved venue in the Southern District of New York.  First, the evidence showed that the stolen car that Montgomery transported from Florida to the New York area was parked in a garage in the Southern District of New York shortly after Montgomery arrived back with it.  Second, the evidence showed that the car had to have passed over the waterways of the Eastern District of New York, a fact which is sufficient to lay venue in this District.

**1.    Applicable Law**

The proper forum for a criminal prosecution is the district in which the crime was committed.  U.S. Const. Art. III, § 2; id. Amend. VI; Fed. R. Cr. P. 18.  Although determining a single particular venue for "point in time" crimes -- crimes in which "the unitary character of the acts constituting the crime renders its locus delicti obvious," United States v. Saavedra, 223 F.3d 85, 88-89 (2d Cir. 2000) -- is often straightforward, in "some cases the acts constituting a crime extend over a period of time, and occur in widely different localities."  Id. at 89.  Where "the acts constituting the crime and the nature of the crime charged implicate more than one location," the

17

Constitution "does not command a single exclusive venue."  United States v. Reed, 773 F.2d

477, 480 (2d Cir. 1985).

Accordingly, a defendant charged with a "continuing" offense may be tried in any district

in which some part of the offense occurred.  See, e.g., United States v. Naranjo, 14 F.3d 145, 147

(2d Cir. 1994); United States v. Delia, 944 F.2d 1010, 1013-14 (2d Cir. 1991).  In this regard, 18

U.S.C. § 3237(a) provides explicitly that any offense "committed in more than one district" may

be "prosecuted in any district in which such offense was begun, continued or completed."  18

U.S.C. § 3237(a).  Put another way, "[b]ecause an offense consisted of distinct parts which have

different localities the whole may be tried where any part can be proved to have been done."

United States v. Brennan, 183 F.3d 139, 145 (2d Cir. 1999) (quotation marks omitted).

Furthermore and specific to offenses involving "transportation in interstate or foreign

commerce," such as Section 2315, Section 3237(a) also provides that:

> Any offense involving . . . transportation in interstate or foreign commerce, . . . is
> a continuing offense and, except as otherwise expressly provided by enactment of
> Congress, may be inquired of and prosecuted in any district from, through, or into
> which such commerce . . . moves.

18 U.S.C. § 3237(a).

In this regard, Montgomery claims (without any support) that his conspiracy to violate

Section 2315 was "completed once the car, 'after being stolen, unlawfully converted, and taken'

initially crossed ANY state boundary, the first of which had to be the state law of Florida."

Montgomery Memorandum of Law in Support of Motion to Dismiss Pursuant to Rule 29 at 7

(dated June 11, 2007) (hereinafter "Montgomery Memo").  It is obvious why Montgomery

provides no support for the claim that a violation of Section 2315 is a one-step crime that was

completed once and for all when the stolen car passed out of the state of Florida: there is no

support for such a proposition. <u>See</u>, <u>e.g.</u>, <u>United States v. Melia</u>, 741 F.2d 70, 71-72 (4th Cir.

1983) (violations of section 2315 are governed by "continuing offense" venue provision of

3237(a)); <u>United States v. DeKunchak</u>, 467 F.2d 432, 437-38 (2d Cir. 1972) (same).

As a result, crimes charged under Section 2315 are routinely prosecuted -- and properly

so -- in any judicial district through which the stolen property was transported. <u>See</u>, <u>e.g.</u>, <u>United

States v. Armenteros</u>, No. 06 Cr. 155, 2006 WL 3404815, *1 (M.D. Fla. Nov. 24, 2006) (denying

pre-trial motion to dismiss on basis of venue where Government asserted that it would prove at

trial that stolen boat was transported through the Middle District of Florida after it was stolen);

<u>United States v. Friedman</u>, Nos. 95 Cr. 192, 96 Cr. 182, 1996 WL 612456 (E.D.N.Y. June 25,

2006) (where defendant charged with violation of 18 U.S.C. § 2315, "[s]o long as the

government can establish at trial that the artwork traveled through the Eastern District, venue is

proper here.").

On a Rule 29 motion, determining the appropriateness of venue in a given district

requires a two-step process. The first step is to determine, as set forth above, whether the offense

of conviction is a "continuing offense" under § 3237(a).  Second, although not a formal

constitutional test, a court  "must ask whether the criminal activities in question bear 'substantial

contacts' to the Southern District of New York in order to ensure that the policies and

considerations underlying the Constitution's commands respecting venue have been preserved."

<u>Saavedra</u>, 223 F.3d at 89, 93; <u>see also</u> <u>United States v. Svoboda</u>, 347 F.3d 471, 484 n.12 (2d Cir.

2003); <u>Reed</u>, 773 F.2d at 480-82.  The "substantial contacts" test "takes into account four main

factors: (1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the

criminal conduct occurs, and (4) suitability of the venue chosen for accurate factfinding." <u>Id.</u>

(citing <u>Reed</u>, 773 F.2d at 481).  The <u>Reed</u> four-factor test "is helpful in determining whether a chosen venue is unfair or prejudicial to a defendant."  <u>Id.</u>

Where a defendant does not contend that being prosecuted in a particular judicial district "imposed an additional hardship on [him], prejudiced [him], or undermined the fairness of [his] trial," the Court "need not be concerned about jeopardizing the values underlying the substantial contacts test."  <u>United States v. Ramirez</u>, 420 F.3d 134, 143 (2d Cir. 2005) (rejecting sufficiency challenge predicated on venue).  None of the cases concerning the "substantial contacts" test suggest that the district of prosecution must be the district with the <u>most</u> substantial contacts with the crime or that there cannot be <u>multiple districts</u> with substantial contacts with the crime.  This conclusion is most consistent with the policies behind Section 3237(a), which explicitly permit continuing offenses to be prosecuted in multiple judicial districts.[7]

"As to a charge of conspiracy, venue may properly be laid in the district in which the conspiratorial agreement was formed or in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators."  <u>United States v. Ramirez-Amaya</u>, 812 F.2d 813, 816 (2d Cir. 1987).  The Southern District of New York includes Bronx, Dutchess, New York, Orange, Putnam, Rockland, Sullivan, and Westchester counties, and, "concurrently with the Eastern District, the waters within the Eastern District."  <u>See</u> 28 U.S.C. §§ 112(b-c); <u>see, e.g.</u>, <u>Ramirez-Amaya</u>, 812 F.2d at 816 (in importation of narcotics trial, "[t]he evidence was,

---

[7] Montgomery claims that there is an apparent contradiction between the inquiry regarding whether the Government has proven venue by a preponderance of the evidence and the inquiry regarding whether acts proven by the Government constitute "substantial contacts" with the venue of prosecution.  Montgomery Memo at 2; <u>see also</u> <u>id.</u> at 7-8.  There is no contradiction in the tests to be applied by the Court.  The purpose of the "substantial contacts" test is to assist the Court in determining whether a chosen venue is unfair or prejudicial to a defendant and aims to vindicate the constitutional command concerning venue.

however, that the course of the flight carried the airplane over the Narrows, a body of water that

lies within the joint jurisdiction of the Southern and Eastern Districts of New York, see 28

U.S.C. § 112(b).  This was sufficient to make venue in the Southern District proper.").

     2.    **Discussion**

At trial, Singh testified to certain critical facts relating to Montgomery's involvement in

the stolen car conspiracy. Singh was aware that Shyne and Bennett  purchased about three cars

from Euro Motor Sports by using a counterfeit check, in the amount of about $300,000.  Tr. 283-

85.  Bennett used the name Dmitriy Makarevich, a stolen identity, to purchase the cars.  Tr. 285;

see Tr. 216.  Singh heard that "there was a problem getting the car back on a timely basis,"

specifically that "the arrangement they had was for the truck to bring the cars but the truck had

broken down somewhere along the line so it delayed the car maybe a day or two."  Tr. 285.  This

made Shyne and Bennett nervous because they wanted to sell the car quickly before the

counterfeit check was returned.  Tr. 285.  As a result, Shyne and Bennett "decided to get Butch to

go get the car," a reference to Montgomery.  Tr. 285; see Tr. 215.

Singh heard Shyne discussing Montgomery's flying to Florida, but was unaware how

Montgomery ultimately traveled there.  Tr. 285-86.  While at home, Singh overheard Shyne on

the phone discussing with Bennett and Montgomery the progress that Montgomery was making

in returning with the car back from Florida, directing Montgomery along the way "to hurry up

and get back here fast.  Just don't go hang out with the car."  Tr. 286.  Montgomery quickly

arrived back in New York with the car; Singh knew that "up to a point they parked it in the

garage" "[i]n Manhattan."  Tr. 287.  The plan for the car transported by Montgomery was that it

was to be sold to a car dealership on Hillside Avenue.  Tr. 286.

These facts are sufficient to satisfy the Government's obligations to prove venue by a preponderance of the evidence. First -- and most to the point -- the fact that the Mercedes SL55 that was stolen from Euro Motor Sports was parked in Manhattan clearly makes venue sufficient in this District. The co-conspirators stowed a piece of stolen property in Manhattan in order to facilitate their "fencing" it promptly. This satisfies the Government's venue obligation to prove that an overt act in further of the conspiracy charged in the Indictment occurred in this District. Montgomery labels this evidence "so sketchy as to not be reliable." Montgomery Memo at 9. However, this label is contrary to the standards governing a Rule 29 motion, which require the Court to credit Singh's testimony on this point and draw every inference that the jury might have drawn in the Government's favor. Based on this testimony, the answer to the question of whether a rational jury could have found venue by a preponderance of the evidence is an emphatic "yes."[8]

Second, even had Montgomery returned directly to Brooklyn, there is no remotely logical route that Montgomery could have taken back to Brooklyn that would not have carried him either through Manhattan or over the waterways of the Eastern District of New York. For example, Montgomery -- who was being rushed back to New York by Shyne, Tr. 286 -- could either have taken one of the Hudson River crossings (the Lincoln or Holland Tunnels or the George Washington Bridge), all of which would have carried him through Manhattan. Or Montgomery could have crossed from New Jersey into Staten Island and then over the Verrazano-Narrows

---

[8] The fact that this evidence was contradicted by Montgomery's is irrelevant for the purposes of this motion, since the Court reserved decision on Montgomery's motion at the close of the Government's case and, therefore, should not consider Montgomery's testimony on this point. See Velasquez, 271 F.3d at 371-72.

bridge into Brooklyn, which would have taken him over the waterways of the Eastern District of New York. Such a route for a piece of stolen property would have conferred venue in the Southern District of New York. See Ramirez-Amaya, 812 F.2d at 816. Even if it is "just as logical" for Montgomery to have taken this route, Montgomery Memo at 8, then this route was sufficient to confer venue in this District. When a piece of stolen property passes through the Southern District of New York -- or over its waterways -- as a result of the actions of a conspirator, the conspiracy to transport that piece of stolen property may properly be prosecuted in the Southern District of New York.

As for whether the Government proved that "the criminal activities in question bear 'substantial contacts' to the Southern District of New York," Saavedra, 223 F.3d at 89, the Court need not make any finding on this issue. This is because nowhere does Montgomery articulate -- even remotely -- an argument that his prosecution in this District "imposed an additional hardship on [him], prejudiced [him], or undermined the fairness of [his] trial." Accordingly, the Court "need not be concerned about jeopardizing the values underlying the substantial contacts test." Ramirez, 420 F.3d at 143. Montgomery was not dragged into a distant judicial district for his trial. He traveled all the way from Brooklyn in the Eastern District of New York to lower Manhattan for his trial. Tr. 2213-14. It is hard (no, impossible) to say that his trial was unfair because it did not occur at the other end of the Brooklyn Bridge. Cf. United States v. Castellano, 610 F. Supp. 1359, 1389 (S.D.N.Y. 1985) ("No unfairness or hardship has been identified as having been created by the trial of this case at the Manhattan end of the Brooklyn Bridge as opposed to the Brooklyn end."). Montgomery does not contend otherwise. Nor does he suggest that his trial would have been more convenient to him (or anyone else) if it were held in the

Southern District of Florida, the place to which he traveled to pick up the stolen car.

But even were the Court to make a finding about "substantial contacts," it is clear that the conspiracy to steal cars of which Montgomery was convicted bears substantial contacts to this District. Applying the four <u>Reed</u> factors, the Court should conclude that the multiple sites of this crime were where the illegal agreement was formed and every judicial district through which the stolen property was transported by Montgomery, including this District. Overt acts in furtherance of the conspiracy to steal these vehicles -- in particular, transporting the car through Manhattan and stowing the car in Manhattan for it to be fenced -- occurred in this District and these overt acts were, for sure, substantial. After all, the goal of the conspirators was to quickly sell the stolen cars and realize the proceeds before the check used to steal the cars was discovered to be counterfeit. The elements of this crime (the existence of the conspiracy, the defendant's membership in it, and an overt act in furtherance of the conspiracy)[9] suggest that what occurred in this District (stowing a stolen car for later resale) was a substantial contact. The nature of the charged crime was a conspiracy to receive, <u>possess</u>, <u>conceal</u>, <u>store</u>, barter, sell, and dispose of stolen goods. Although the receipt occurred in Florida,[10] the possession occurred in a great number of judicial districts (including Manhattan) and the concealment and storage of the stolen

---

[9] The Court specifically charged the jury on the elements of this count as follows: "I have previously instructed you with respect to the first and second elements of conspiracy. That is the existence of the conspiracy and membership in the conspiracy and you should follow those instructions here. This count contains an additional element. The third element the government must prove beyond a reasonable doubt to establish the offense of conspiracy to sell, receive or possess stolen goods is that at least one overt act in furtherance of the conspiracy was knowingly committed by at least one of the conspirators at or about the time and place alleged." Tr. 3383.

[10] Accordingly, as to the <u>Reed</u> factor regarding the locus of the effect of the criminal conduct, that was principally the district from which the car was stolen (the Southern District of Florida). Tr. 1583.

car occurred in Manhattan.  Finally, there is nothing about the Southern District of New York that would suggest that less than inaccurate factfinding occurred or that more accurate factfinding would have occurred in either the Eastern District of New York or the Southern District of Florida.  For example, nowhere has Montgomery identified a witness that he sought to call who was not called because of that person's inability to travel to this District.  The balance of all of the Reed factors compels the conclusion that the Southern District of New York was one of the judicial districts to which the criminal conduct charged in Count Five of the Indictment bore a substantial contact.

Accordingly, the Court should reject Montgomery's Rule 29 motion predicated on venue.

**B.      Montgomery's "Knowledge" Argument Is Meritless.**

Montgomery next argues that the proof at trial failed to establish that he "could have known that a counterfeit check was used to purchase the vehicles."  Montgomery Memo at 11.  The supposed factual support for this argument is primarily Montgomery's claim that he was brought into the conspiracy "when someone was needed to pick up one of the cars when the truck 'broke down" and the assertion that "there is no evidence that . . . Montgomery knew anything about the method of payment for the cars at the time payment was made."  Id.  Relatedly, Montgomery claims that "none of the evidence presented by Gene Morales contained any reference to how the first three cars were paid for:  there was no discussion of a check, much less any discussion of the check being counterfeit."  Id. at 12.

Montgomery's arguments are lacking in factual support.  First, there was plenty of evidence demonstrating that Montgomery was involved in the purchase of the first three automobiles from Euro Motor Sports from the beginning, at least ten days prior to the date on

which Montgomery flew to Florida to pick up the cars.  Specifically, in November 2004, Gene

Morales, the proprietor of Euro Motor Sports located in Hollywood, Florida, spoke by telephone

with "Dmitriy Makarevich," a customer to whom Morales had sold a car and from whom

Morales had purchased a car before.  Tr. 1498 (testimony of Morales); see Tr. 1483-97

(testimony of Morales).  Of course, Dmitriy Makarevich was a stolen identity used by Bennett.

Tr. 216, 547 (testimony of Singh).  Bennett had never held any legitimate job during the years

that Singh knew him, Tr. 212, 547 (testimony of Singh), and had served time in prison for fraud,

Tr. 211.  Together with the person he described as his partner, Bennett wanted to purchase from

Euro Motor Sports a "nice package of cars."  Tr. 1498 (testimony of Morales).  Bennett provided

Morales with the name of his partner:  Roberto Montgomery.  Tr. 1500.

　　　　At first, Bennett chose to purchase a BMW M5, a Mercedes-Benz SL500, and a

Mercedes-Benz SL55; eventually, Bennett chose to purchase a Porsche Cayenne instead of the

BMW M5.  Tr. 1500.  Bennett told Morales that Bennett "was going to send a check from one of

his companies," Tr. 1502, and on November 17 or 18, 2004, Bennett sent Morales a check for

$277,000 by FedEx for these three cars.  Morales deposited the check and, after ten days, it

cleared.  Id.  Montgomery signed bills of sale for each of these three cars, GX 97 through 99,

before November 19, 2004, the date on which the bills of sale arrived by FedEx at Euro Motor

Sports.  The signature on the bills of sale is dated November 19, 2004.  Tr. 1512; GX 97-99. On

November 26, 2004, Montgomery deposited into his Bank of America bank account a check for

$15,896.92 from Euro Motor Sports, which represented (as indicated in the "memo" line of the

check) a refund of collected sales tax.  See GX 81.

　　　　Several days later, on November 29 or 30, 2004, Montgomery flew down to Florida to

pick up the Mercedes-Benz SL55.  Tr. 1506.  When Montgomery arrived at Euro Motor Sports,

he referred to Dmitriy as his "partner."  Id.  Montgomery signed the bill of sale for the Porsche

Cayenne car in the presence of Morales.  Tr. 1504, 1512-14; GX 96.  For each of the four bills of

sale that Montgomery signed -- including the one signed in Morales's presence -- Montgomery's

signature appears directly adjacent to the signature of "Dmitriy Makarevich."  See GX 96-99.

Montgomery handed to Morales an envelope containing two more counterfeit checks -- for

$243,000 and $250,000 --  representing the purchase price of additional cars to be purchased by

Dmitriy Makarevich and Montgomery.  Morales opened the envelope and looked at the checks in

Montgomery's presence.  In Morales's presence, Montgomery signed paperwork for the purchase

of additional cars at that time.  Tr. 1517, 1557, 1559, 1561.  As is evident from all the foregoing,

Montgomery was involved in the conspiracy well before his journey to Florida, as early as prior

to November 19, 2004.

Second, the assertion that Gene Morales did not testify as to how the first three cars were

paid for is incorrect:

> Q.    What was the total amount that you were going to charge Dimitriy and
>        Roberto Montgomery for these three cars?
>
> A.    277,000.
>
> Q.    Do you recall how that broke down in terms of each car?
>
> A.    Exactly I don't recall, but the SL55 was over a hundred, like 112.  Then
>        the other two were -- I don't remember exactly, but I remember the only
>        one over a hundred was the SL55.
>
> Q.    How did Dimitry and Roberto Montgomery pay for these cars?
>
> A.    They overnighted me a check.
>
> Q.    Let me show you what has been marked as Government Exhibit 95.  Do

you recognize that?

A.    Yes.

Q.    What is it?

A.    It is the check that they paid the three cars with.

Q.    About when did you receive it?

A.    November, I think it was November 18th or November 17th, around that date.

Tr. 1500-01.

Third, there was more than sufficient evidence that the $277,000 check sent by Bennett to Morales was counterfeit:  Bennett had no legitimate job and no legitimate connection whatsoever to the maker of the check, Massimino Building Corporation.  Tr. 212, 547; GX 95.  And there was plenty of evidence that the paying bank on this check -- Commerce Bank, N.A. -- was aggressively pursuing Morales in relation to the cars that were purchased with this check.  Tr. 1568, 1570, 1605-07.  Singh testified that the check used to pay for these cars was counterfeit. Tr. 283-85.  Most importantly, Morales specifically testified that he learned that the $277,000 check was counterfeit, after he learned that two additional checks that had been handed to him by Montgomery (one for $243,000 and the other for $250,000) were also counterfeit.  Tr. 1605; GX 100A-D.[11]

Finally, there was more than sufficient evidence from which a rational jury could have concluded that Montgomery had the mental state required for conviction -- that he knowingly and

---

[11] Montgomery's claim of a variance between the proof at trial relating to the counterfeit nature of the $277,000 check and the Indictment, see Montgomery Memo at 9-10, is an utter non-sequitur.  The Government proved that the $277,000 check was counterfeit.

intentionally became a member of the charged conspiracy.[12]  Montgomery was well aware that

Bennett was purchasing cars under a fake identity.  After all, Montgomery signed a number of

bills of sale -- including those signed in Morales's presence -- directly adjacent to the name of the

co-purchaser of the car -- "Dmitriy Makarevich."  Moreover, Montgomery had a conversation

with Morales about his "partner," "Dmitriy" -- the assumed alias of his cousin, roommate, and

"close" friend, Bennett, see, e.g., Tr. 213, 215.  And due to the closeness of his relationship  with

Bennett, Montgomery would have been well aware that Bennett had no legitimate job and,

therefore, no legitimate source of money to pay $277,000 for the cars that were purchased, one of

which Montgomery drove back to New York, and no legitimate source of money to pay $493,000

for the additional cars for which Montgomery handed Morales two additional counterfeit checks.

---

[12] It is not at all the case that the Government needed to prove that Montgomery specifically knew that a counterfeit check was used to purchase the vehicles, as suggested by Montgomery, see Montgomery Memo at 11.  As the Court instructed the jury -- without objection from Montgomery -- what the Government was required to prove was the following:

> I have previously instructed you with respect to the first and second elements of conspiracy.  That is the existence of the conspiracy and membership in the conspiracy and you should follow those instructions here.  This count contains an additional element.  The third element the government must prove beyond a reasonable doubt to establish the offense of conspiracy to sell, receive or possess stolen goods is that at least one overt act in furtherance of the conspiracy was knowingly committed by at least one of the conspirators at or about the time and place alleged.

Tr. 3383.  Furthermore, the Court charged the jury -- again without objection from the defendant -- that "a defendant need not have been fully informed as to all the details or the scope of the conspiracy in order to justify an inference of knowledge on his part."  Tr. 3355.  Montgomery could have been found guilty of the charged conspiracy, even if he did not know that the check used to pay for them was counterfeit, as long as he had knowledge of "at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends."  Tr. 3358.  As set forth herein, a rational jury could easily have concluded that Montgomery did know that the cars were being stolen.

And, importantly, Montgomery handed two big-ticket checks to Morales -- which Morales opened in Montgomery's presence -- to pay for a number of additional cars on behalf of himself and "Dmitriy," his "partner."  A rational jury was certainly entitled to infer that Montgomery was aware (at the very least, as of that point in the conspiracy) that the first set of cars also had been purchased with a check, and that neither of those checks were legitimate (and were, in point of fact, counterfeit, as charged in the Indictment).  Plus, a rational jury could infer that the only reason why Montgomery went to Florida in the first place was because he recognized that the cars needed to be brought back to New York and sold quickly -- before the check used to pay for them came back as counterfeit.  These facts, among others, were more than a sufficient basis upon which to conclude that Montgomery knowingly and intentionally became a member of the charged conspiracy.

## IV.    Conclusion

For the reasons set forth below, the Court should deny Montgomery and Pitambar's Rule 29 motions.

Dated: August 10, 2007
          New York, New York

                                    Respectfully submitted,

                                    MICHAEL J. GARCIA
                                    United States Attorney


                         By: _____/s/_____
                                E. Danya Perry/Daniel W. Levy
                                Assistant United States Attorneys
                                Telephone:  (212) 637-2434/-1062

## <u>AFFIRMATION OF SERVICE</u>

DANIEL W. LEVY, pursuant to Title 28, United States Code, Section 1746, declares under the penalty of perjury:

I am employed in the Office of the United States Attorney for the Southern District of New York.

On August 10, 2007, I caused the foregoing GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS to be served via Clerk's Notice of Electronic Filing upon the following attorneys, who are filing users in this case:

Thomas H. Nooter, Esq.
Freeman Nooter & Ginsberg
30 Vesey Street, Suite 100
New York, New York 10007

Counsel to defendant Roberto Montgomery

Denis P. Kelleher, Jr., Esq.
Kelleher & Dunne LLP
17 Battery Place, 11th Floor
New York, New York 10004

Counsel to defendant Naresh Pitambar

Bryan H. Hoss, Esq.
Davis & Hoss, PC
508 E. 5th Street
Chattanooga, Tennessee 37403

Counsel to defendant Steven Riddick

Bruce A. Barket, Esq.
Bruce A. Barket, P.C.
666 Old Country Road, Suite 600
Garden City, New York  11530

Counsel to defendant Nathaniel Alexander

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  New York, New York
        August 10, 2007


_____/s/_____
Daniel W. Levy

ii