# FREEMAN, NOOTER & GINSBERG
### ATTORNEYS AT LAW

LOUIS M. FREEMAN
THOMAS H. NOOTER*
LEE A. GINSBERG

30 VESEY STREET
SUITE 100
NEW YORK, N.Y. 10007

(212) 608-0808
TELECOPIER (212) 962-9696

*NY AND CALIF. BARS

August 29, 2007

Hon. Kenneth M. Karas
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

BY ECF and mail

RE:    United States v. Shyne, et. al,. including Roberto Montgomery, 05 Cr 1067 (KMK)

Your Honor:

     I am writing to reply to the government's brief in opposition to my motions for acquittal made pursuant to both Rule 29(a)(where decision was reserved by the Court) and Rule 29(c)(1)(after verdict). I hope this informal "letter-brief" is acceptable.

     I moved for a judgment of acquittal based on these two subsections of the Rule on two grounds: 1) venue, and 2) sufficiency of knowledge that the vehicles were stolen or converted by use of a counterfeit check. The difference between the two procedural approaches, I would argue, is that for Rule 29(a), the Court must view the evidence as it stood at the close of the government's case, and for Rule 29(c)(1) the Court can look at all of the evidence presented. Either way the Court seems to be bound by the rule of looking at the evidence in the light most favorable to the government. I suggest that this means that credibility disputes or conflicts in the evidence are to be resolved in favor of the government. When the defense-case evidence merely amplifies or clarifies evidence which was left ambiguous or not fully explained I suggest that the Court can accept a rational finding of the facts which is not contradicted by the government's presentation of evidence. I note that in this connection that the Court can accept the defendant's version of events with respect to any fact which was not contradicted by the government proof or challenged on cross-examination.  Put more simply, gaps in the proof which are filled by the defense proof which is not contradictory to the government proof can be accepted to make a necessary finding of fact for purposes of the motion made pursuant to Rule 29(c)(1).

     <u>Venue</u>: The defense position is that the only two "contacts" with the Southern District of New York which are remotely seen in the evidence are 1) Natasha Singh's comment that some time after the vehicle was driven to New York City by Roberto Montgomery it was parked somewhere in Manhattan, and 2) the likelihood that Roberto Montgomery crossed through the Southern District of New York when he drove the vehicle from Florida to Brooklyn.

-1-

<u>Parking the car in Manhattan</u>:

As stated in the opening motion papers, what Natasha Singh said was:

Q.  Did he tell you specifically where it was in New York?
A.  No, I don't know when he came with the car where it was.  I know up to a
point they parked it in the garage.
Q.  Do you know where they parked it?
A.  In Manhattan.

All of the other events related to this or any of the other vehicles took place outside of the Southern District of New York, according to Natasha Singh and Gene Morales, including the planning, making of telephone calls, sending of paperwork and checks, shipping of cars (to New Jersey, mainly), and the intended site where the car driven by Mr. Montgomery was going to be "fenced" (a dealership in Queens).

This evidence is further clarified by Mr. Montgomery's testimony in which he said that after he arrived in New York City he parked the car in a garage in Brooklyn (E.D.N.Y.) and delivered it the next day to Toybe Bennett in Brooklyn ("off Flatbush"). This testimony is both logical and reasonable, given where he lived, and was uncontradicted (because Natasha Singh's testimony does not say when the car was taken to Manhattan). There was no evidence that Mr. Montgomery had any further contact with the car after that.

I submit that if this contact, in light of the full explanation of facts, implicates the issue of "foreseeability" into the venue question. Again I note that Natasha Singh did not say that Roberto Montgomery himself parked the car in Manhattan, and she was specifically imprecise ("up to a point") as to when it was parked in Manhattan, and that parking the car in Manhattan made little sense in view of where Mr. Montgomery lived and where the car was to be disposed of (on "Hillside Avenue"). There is a complete lack of proof, therefore, that Mr. Montgomery ever knew the car was parked in Manhattan [if that ever happened at all].

The Second Circuit's decision in <u>United States v. Svoboda</u>, 347 F.3d 471 (2d Cir. 2003) shows that if the acts or effects which occurred in the district of trial which were not done by the defendant, was also not foreseeable by the conspirators, then venue does not lie in the district even if some effect was felt. The court studied two cases, <u>United States v. Bezmalinovic</u>, 962 F. Supp. 435 (S.D. N.Y. 1997) and <u>United States v. Kim</u> 246 F.3d 186 (2d Cir. 2001), and concluded:

"Taken together, <u>Kim</u> and <u>Bezmalinovic</u> indicate that venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue. See <u>Kim</u>, 246 F.3d at 192 (finding venue proper where the defendant "caused communications to be

-2-

transmitted into and out of the Southern District when he approved fraudulent invoices knowing that [the victim] paid its vendors from New York banks"); Bezmalinovic, 962 F. Supp. at 438 (finding venue improper because the defendant neither intended nor could have foreseen the acts that occurred in the district of venue). Id. at 483.

Judge Cedarbaum's decision in United States v. Bezmalinovic, *supra*, is somewhat instructive on the "foreseeability" aspect of venue, that is, whether it is important that the defendant could have foreseen that the route the contraband would take might take it into the District of trial. She specifically discussed the Second Circuit's decision in United States v. Ramirez-Amaya, 812 F.2d 813 (2d Cir. 1987) (which was cited by the government in their responsive papers in our case), to point out the importance of the defendant having some ability to foresee the possibility that the criminal activity would take place in, or have some effect on, the district of trial. Judge Cedarbaum said:

"The reasoning behind the Ramirez-Amaya court's decision actually emphasizes the importance of foreseeability or control by the defendant over acts in the district in which he is tried. After holding that venue was proper in the Southern District, the Second Circuit stated:

'While we would be loath to uphold venue on the basis of the flight path of an aircraft manned solely by government agents if there were an indication that its route had been significantly out of the ordinary, considering its point of departure and its destination, there is no such indication here. Rather, the proof was that the plane followed a normal route to LaGuardia airport. And though we recognize that LaGuardia was not the destination intended by the coconspirators, they can hardly complain on this basis, for the airport to which they directed the cocaine, Westchester County Airport, is within the Southern District of New York.'

"Id. This explanation demonstrates that the Second Circuit considered foreseeability and intent of the defendants to be important factors in the determination of whether venue was constitutionally permissible. Indeed, the Second Circuit stated that it would be 'loath to uphold venue' solely on the basis of an insignificant contact with this district that was not intended by the defendants or foreseeable to them. The government argues that MHT's and Chemical's acts in Manhattan were part of those institutions' "normal route" for transferring money, just as the airplane's "normal route" took it over the Narrows. Even if true, that is irrelevant. The "normal route" of an airplane between two locations is important because a defendant can foresee that the plane will pass over districts along that route. There is no similar foreseeability in the present case." Id. at 440-441.

-3-

Thus, I would submit that the evidence relied upon by the government from the testimony of Natasha Singh to support Southern District venue should be deemed insufficient because there is absolutely no proof that Mr. Montgomery parked the car in Manhattan or could have foreseen that the car might be parked in Manhattan.

Crossing through the Southern District: The other Southern District contact relied upon by the government is the likelihood that in driving the vehicle from Florida to Brooklyn Mr. Montgomery would have crossed through the Southern District of New York either by taking a route through Manhattan or the Bronx after crossing the Hudson River or by taking a route through Staten Island which involved crossing the Verrazano Bridge which crosses waters between the Southern and the Eastern Districts, which are deemed by statute to be in both districts.

Although I concede that it is very likely that the route taken would have met either of those possibilities, I still maintain that there is absolutely no proof in the record that supports the actual traversing of the Southern District in one of these two ways, and that even though it is extremely unlikely, it is in fact possible to reach Brooklyn without crossing the Hudson at a point which takes one through the Southern District or across the waters which are defined as part of the Southern District. The government, which has the burden of proof on this point, had every opportunity to ask Mr. Montgomery when he was on the witness stand what route he took. They did not. There is no proof, and I submit that "taking the evidence in the light most favorable to the government" does not include inventing evidence where it does not exist.

If the Court finds that the mere probability that the car crossed through the Southern District is sufficient proof to sustain venue, then I would note that it is far more probable that the car took the Verrazano route than any route which actually crossed Manhattan Island or the Bronx if the car was being driven to the neighborhood of defendant's home in Brooklyn. Thus the more probable contact is only the crossing of the waters of the Verrazano Narrows.

I therefore note that the case relied upon by the government and quoted above, United States v. Ramirez-Amaya, there was actual evidence that the airplane entered the district of trial. In that case the conspirators intended the drugs to be delivered in the Southern District (at the Westchester Airport), and the agents flew the plane instead to the Eastern District (LaGuardia Airport). The Court found that the crossing by the plane of the waters between the Eastern and Southern Districts was sufficient to confer venue, but only because the intended route was into the Southern District. The case does not stand for the proposition that crossing the water is itself a sufficient contact to confer venue. The court was "loath to" base venue on just the fact that the plane crossed the common waters of the two Districts, and only chose to do so because that Court felt that it was foreseeable to (and intended by) the defendants that the contraband would affect the district of trial.

On this point there is no foreseeability issue because it would have been Mr. Montgomery himself who crossed through the waters of the Southern District. What there is, however, in

-4-

contract with the proof in <u>Ramirez-Ayala</u>, is a lack of actual proof of the route.

What the court in both the <u>Ramirez-Ayala</u> and <u>Bezmalinovic</u> cases did, at least to some extent, was to consider the strength of the "contact" with the district of trial, as at least a nod to the "substantial contacts" test of <u>United States v. Reed</u>, 773 F.2d 477, 481 (2d Cir. 1985), is to find that in a "passing through the district" case there must both be proof that the contraband did, in fact pass through the district of trial, and that the defendant could have foreseen or intended that possibility.

I realize that most of what I have said was discussed in some form or another in my opening Memorandum of Law, but I wish to emphasize how minor and speculative the Southern District "contacts" are in this case.

<u>Sufficiency of the Evidence on knowledge of the means of the conspiracy</u>:

<u>The variance argument</u>:

The arguments on this point are very fact-specific, and most of the facts have been laid out in detail in the defendant's opening motion papers and in the government's opposition. I want to note a few things however:

First, the government in footnote 12 seems to argue that the jury charge somehow defines the specificity of the means of the conspiracy required to prove count 15. While I may have failed to object or to propose different language [which would be a matter of appeal on a "plain error" analysis], we are discussing the sufficiency of the proof, not the sufficiency of the jury charge. For the Rule 29(a) motion, it is the proof at the close of the government's case that is relevant, and the proof has to conform with the pleadings. Even for the Rule 29(c)(1), post-verdict motion, I am only challenging the level of proof presented by the government, as amplified by the uncontradicted proof offered by the defense which may have (as I previously discussed) filled in gaps left by the government's proof. Moreover, if the jury charge was insufficiently specific on the means of the conspiracy because it failed to adequately instruct the jury that they should make findings that are required by the indictment, then that might explain why the jury convicted on the count even though the evidence was not legally sufficient.

Second, with respect to the facts which do not, as I argued, show knowledge on the part of Mr. Montgomery that the means of this conspiracy include the conversion of vehicles through the use of a counterfeit check[1], I rest on the factual arguments I made in the opening motion

---

[1]The indictment states: "to wit, TOYBE BENNETT, ROBERTO MONTGOMERY, and others used a counterfeit check to purchase at least approximately three vehicles in Florida, which the conspirators subsequently transported or caused to be transported to New York... ." The only transaction for cars which were actually transported or caused to be transported to New York was the one involving the purchase of cars with the $277,000 check.

papers.[2] I reemphasize that according to the government's witness, Natasha Singh, all of the communications between the conspirators and the car dealership prior to Mr. Montgomery's being recruited to pick up a car were conducted by Toybe Bennett and Douglas Shyne.

The government's "second" point is irrelevant: the fact that a counterfeit check was used to pay for the cars is not disputed. The fact that Mr. Montgomery was ever in a position to know that the payment was made with a counterfeit check, as opposed to any other legitimate or illegitimate means, is what is not proved. The government's "third" point is also irrelevant, because there is no evidence that Mr. Montgomery ever saw, sent or even told about the $277,000 check;[3] the fact that Bennett may not have appeared to have sufficient assets to purchase these cars is not sufficient to impute knowledge of the counterfeit nature of the check used to purchase the cars, even if it were enough to impute knowledge that something was suspicious about the transactions because of the fake identity used by Bennett (assuming Mr. Montgomery was aware of that) or because of Bennett's supposed joblessness.

The government's analysis also rests mostly on what "fair inferences" can be drawn from the defendant's familiarity with Toybe Bennett and his supposed lack of financial resources. These are merely guesses, because there is no direct evidence of what the defendant saw or was told except by the defendant's testimony which contradicts these inferences. I am not saying that the Court has to accept the defendant's version of his perceptions of Bennett for this motion, but I don't think the Court should accept a version which was never discussed by any witness to make speculative factual findings which contradict what the defendant said in his testimony (which is that Bennett had an explanation for why he was dealing in these cars and that he was seen with an expensive car).

In short, although I would submit that there never was sufficient proof that Mr. Montgomery could even have known that the proposed transactions were illegal, I mainly rely on the fact that the proof does not conform to the charge as stated in the indictment, which was very specific that the means for the theft or conversion of these vehicles was to be the use of the counterfeit check. The rationale for avoiding variances from the indictment is discussed in the cases I cited in the original Memorandum of Law, but I would note again that this case was tried, in reliance on the wording of the indictment, by trying to show a failure of proof that the defendant could have known that cars were being paid for by counterfeit checks: to expand the charge now to include any other form of illegality would represent a prejudicial variance which is legally and constitutionally invalid.

---

[2]In my opening Memorandum of Law I cited United States v. Kaplan, 490 F.3d 110 (2d Cir. 2007) with only a Lexis and Westlaw citation: the pages referred to in the official reporter would be 490 F. 3d 128-131.

[3]Note that the other two checks which Mr. Montgomery could have seen, because they were handed by him in an envelope to Gene Morales in Florida, were not counterfeit.

Finally, even though I know that each charge in the indictment stands on its own, it is hard to ignore the fact that the jury acquitted of the charges which related to use of counterfeit checks and laundering money obtained through the use of counterfeit checks, which strongly suggests that they made a finding that the "means" of the conspiracy was some other form of illegality, or more likely, that the defendant should have known that the purchase of the cars involved some form of illegality, but that he did not know that it was specifically by use of counterfeit checks.

Specific Intent:

I have argued that the government had to prove the specific "means" stated in the indictment for the commission of the conspiracy charged because of the way it was charged in the indictment. I submit that for the government to prove the charge in count 15 they must have proved that the defendant agreed to commit the conspiracy charged, which in this case included a specific purpose to steal merchandise with the use of a counterfeit check.

After reading some other cases, however, I wish to expand the argument. I submit that the government has not proved that the defendant had the specific intent to engage in the theft or conversion of the vehicles by any means. In United States v. Tavoularis, 515 F.2d 1070 (2d Cir. 1975), the Circuit upheld the rule that the underlying substantive crime has a specific intent requirement, then that requirement applies to the conspiracy to commit that crime, 515 F. 2d at 1074:

> Where a substantive offense requires specific knowledge, that same knowledge must be established before a defendant can be found to be a member of a conspiracy to commit that offense. United States v. Hysohion, 448 F.2d 343, 347 (2d Cir. 1971). This applies equally to an aider and abettor [*] as to a conspirator, and the requisite knowledge cannot be imputed from one aider and abettor or conspirator to another. United States v. Steward, 451 F.2d 1203, 1207 (2d Cir. 1971). Therefore, if there was insufficient evidence of knowledge on the substantive count, the conviction on the conspiracy count is equally defective.

The court went on to say:

> Our system of administering justice requires that a defendant, no matter how guilty he may be of *some* crime, cannot be convicted unless there is proof beyond a reasonable doubt that he committed the *particular* crime with which he is charged. Id. at 1077; [emphasis in original].

In this case the statute, 18 U.S.C. § 2315, does not itself require that the theft or conversion be by

use of a counterfeit check (the way 18 U.S.C. § 2113(c) requires specific knowledge that the theft was from a bank), but it does require a specific intent to conspire to possess merchandise that has been stolen or converted.

The government has argued that the circumstances surrounding Mr. Montgomery's retrieval of the vehicle in Florida are sufficient to show that he had sufficient knowledge that the vehicle was being stolen or converted. In this respect the Second Circuit's decision in United States v. Samaria, 239 F. 3d 228 (2d Cir. 2001) is instructive. In that case a gypsy cab driver was charged with possession of stolen merchandise and other related crimes because he was in the presence of co-defendants when they retrieved mail-ordered merchandise which had been acquired using fraudulently-obtained credit card numbers, and he helped them carry it away in his rental car, but with one of the co-conspirators driving. He also made a "false exculpatory" statement on arrest. Id. at 231-232. A few days later the defendant was again in the presence of the co-conspirators when they retrieved two boxes at a mailbox store: the co-conspirators first took the packages in a yellow cab with the defendant following in his own car, and then a few blocks away they removed the boxes from the cab and then were arrested. Id.

The Court in Samaria, after reciting the usual language about how intent may be proved, noted:

> Nevertheless, conspiracy to receive or possess stolen goods is a specific intent crime, requiring that the government establish beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute. *See* United States v. Gaviria, 740 F.2d 174, 183 (2d Cir. 1984); *see also* United States v. Wallace, 85 F.3d 1063, 1068 (2d Cir. 1996) (defining unlawful intent in conspiracies as the "specific intent to achieve the object [of the conspiracy]"); United States v. Pinckney, 85 F.3d 4, 8 (2d Cir. 1996) (explaining that for criminal conspiracy, the government "must prove that the intended future conduct [the conspirators] agreed upon includes all the elements of the substantive crime") (internal quotation marks and alternations omitted); United States v. Sanchez Solis, 882 F.2d 693, 696 (2d Cir. 1989) (requiring for a conspiracy conviction that "there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it") (internal quotation marks omitted). Id. at 234.

The Court summarized the government's evidence in that case as follows:

> The government proof consisted of assertions that Elaiho had (1) made false exculpatory statements when arrested; (2) observed the

goods themselves; (3) served as a "lookout" during the November 13, 1998 delivery; (4) consciously avoided discovery of the nature of the conspiracy; (5) constructively possessed the stolen goods; (6) rode as a passenger in his car during the November 13, 1998 pickup and was present at the second pickup. Id. at 236.

The Court discussed the specific "circumstantial evidence" offered, as well as the doctrine of "conscious avoidance" in its analysis. The Court also considered the "false exculpatory statements" of the defendant. In doing so, the Court kept saying that it was taking the evidence in the light most favorable to the government. The facts showed that the defendant was not "merely present" because he took actions in connection with the criminal activity – he was not merely a passive observer. The Court also noted the other suspicious circumstances shown by the defendant's unusual actions, such as appearing to be a look-out, and his false exculpatory statements.

Taking each of these "facts" in turn, however, the Court pointed out that they were not sufficient to support the specific intent to participate in the crimes charged. Id. at 240. In concluding that the evidence was not sufficient, the court stated: "The broad reach of the federal conspiracy and aiding and abetting statutes do not extend so far as to permit conviction upon evidence of mere association or suspicion." Id. at 242.

The circumstances in this case are not dissimilar insofar as the actions taken by Mr. Montgomery were innocent in themselves, and there was little to raise suspicion that the mission he was sent on by Bennett was a criminal mission, one which specifically involved obtaining stolen property.

I submit that on either theory – lack of evidence that the defendant committed the crime as charged in the indictment, and lack of evidence of specific intent – there was insufficient evidence to sustain a conviction on this count.

In conclusion, I respectfully move for a judgment of acquittal on the sole remaining count of the indictment, Count 15, as to Mr. Montgomery.

Sincerely,

 /s/ Thomas H. Nooter
Thomas H. Nooter
Attorney for Roberto Montgomery

cc:    AUSAs and counsel, via ECF