# FREEMAN, NOOTER & GINSBERG
## ATTORNEYS AT LAW

LOUIS M. FREEMAN
THOMAS H. NOOTER*
LEE A. GINSBERG

*NY AND CALIF. BARS

30 VESEY STREET
SUITE 100
NEW YORK, N.Y. 10007

(212) 608-0808
TELECOPIER (212) 962-9696

December 18, 2007

Hon. Kenneth M. Karas
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601-1901

BY ECF and mail

RE:   United States v. Shyne, et. al,. including Roberto Montgomery, 05 Cr 1067 (KMK)

Your Honor:

      I am sending the Court the enclosed packet of letters from family, friends, and co-workers of my client, Roberto Montgomery, in support of our application for a sentence below the Guidelines range.

      Almost more important to my client and to all these people – especially his disabled mother – than the likelihood of imprisonment is the effect that this conviction will have on Mr. Montgomery's ability to seek "cancellation of removal" in Immigration Court after he finishes serving his sentence. I do immigration work and I have a great deal of experience in that particular kind of application for relief from removal.

      Pursuant to the Immigration and Nationality Act, Section 240A(a) ("cancellation of removal for certain permanent residents") (8 U.S.C. § 1229b(a)), my client would qualify for discretionary relief from removal if the following conditions are met: a) he has been lawfully admitted for permanent residence for not less than five years (prior to the commission of the crime) – which is true in this case, b) he has resided in the United States continuously for seven years after being admitted in any status (also true in this case), and c) has not been convicted of any aggravated felony.

      "Aggravated felony" is defined in I.N.A. §101(a)(43) in a listing of various specific felonies: the one which is relevant here is under §101(a)(43)(G) "a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment at [sic] least one year." 8 U.S.C. 1101(a)(43)(G). [I note that there was a misprint in the drafting of this

-1-

provision, but the BIA has interpreted this to mean "the term of imprisonment <u>was</u> at least one year ." *Cf.* <u>Matter of Cota-Vargas</u>, 23 I. & N. Dec. 849 (BIA 2005).]

      Thus, if Mr. Montgomery is sentenced to a term of imprisonment of one year or more (including "a year and a day", which his sister unfortunately received), he will not be eligible for cancellation of removal. He would also not be eligible for any other form of relief from removal, and would probably be barred from re-entry into the United States for life. (I.N.A. §212(a)(9)(A)(ii)(II), 8 U.S.C. §1182(a)(9)(A)(ii)(II)).

      If Mr. Montgomery qualifies for cancellation of removal because the sentence in this case is less than one year he will still have to show that his removal would be a hardship to other persons. I believe that the hardship to his mother and children will most likely be sufficient for an immigration judge to grant cancellation. He will never get to that point, however, if the sentence here is one year or more.

      Therefore I am asking the Court to look at the factors listed in 18 U.S.C. § 3553(a) and fashion a sentence which will avoid doing tremendous damage to the family members who surround and depend upon him. I am sure the Court is aware of the Supreme Court's decisions in <u>Gall v. United States</u>, Slip Op. 06-7949 (12/10/07) and <u>Kimbrough v. United States,</u> Slip Op. 06-6330 (12/10/07) in which the Court made a point of saying that District Judges have wide discretionary latitude in fashioning a sentence which fits the individual needs of the case and of the person being sentenced. It is with that in mind that I ask the Court to look at the special circumstances I have described above, and consider a sentence of 11 months or less.

<u>Sentencing Guidelines Calculation:</u>

      I am also requesting a recalculation of the Guidelines, and opposing the Government's requested recalculation.

A. <u>Loss Amount</u>:

      I contend that the only truly knowable loss amount attributable to Mr. Montgomery from the car conspiracy is the value of the single vehicle he picked up at the dealership (for which the value was, I believe, $113,000). Although there is certainly an interpretation of the facts – depending upon who is believed as a witness (which I will refer to in greater detail hereinafter) – that the full amount of the checks which were used to "purchase" the cars (either just the $277,000 check for the initial three cars, or with the addition of the two checks that Gene Morales claimed were brought to him by Mr. Montgomery), could be used to calculate a loss amount which was "foreseeable" or within the knowledge of Mr. Montgomery, I contend that the most reliable evidence is that of Ms. Singh, who testified that to her knowledge Mr. Montgomery had no role in ordering cars or negotiating prices for cars, but that, as a last-minute response to a problem of having the cars be delivered to New York, was recruited by Douglas Shyne and Toybe Bennett to go down to Florida and bring back a car. This testimony has been quoted by me

in the post-trial motions previously filed, but generally can be found at T., pages 283-287.

  I contend that the testimony of Gene Morales, to the extent that it conflicted with the testimony of Mr. Montgomery, was not sufficiently credible for the Court to make a finding that Mr. Montgomery did some of the other activities in relationship to these cars (brought checks and pre-signed purchase orders in a Fedex or DHL package, signed purchase order documents at the dealership, etc.) because Gene Morales's testimony was no more credible that Mr. Montgomery's. He had a motive to fabricate (because, despite his completely implausible claim that he had only just learned that his dealership was a defendant in a lawsuit filed by Commerce Bank, he had an interest in seeing Mr. Montgomery be convicted), and he was shown to have lied on at least one clear occasion (claiming that he gave Mr. Montgomery a check on November 30th which we know was deposited on November 26th), and because his ever-changing stories and the contradictions between his testimony from that of statements he made to the agent do not make him especially reliable on any of the details of the transactions of which he testified. He appeared to be embellishing his story the more he told it, and much of what he said defied common sense, such as that he would be providing $500 or $600 cash (a fact he had earlier unequivocally denied) to Mr. Montgomery for traveling expenses when he supposedly believed that Mr. Montgomery was a purchaser (and not just a courier) of the very expensive car that he came to pick up. These points were made during the cross-examination of Morales (T. 1563-1611), the questioning of Agent Rosenblatt (T. 2207-2212), from an examination of the handwriting on the purchase orders (discussed in summation at T. 3211-3214), the fact that they were pre-signed and faxed by the dealership's agent in contradiction to what Morales claimed was normal procedure, (T. 1575-1578), and in summation (T. 3193-3215).

  I am not asking the Court to retry the case. I am, however, suggesting that there is considerable doubt as to the true extent of Mr. Montgomery's involvement or knowledge of anything beyond the one car he picked up because of all the problems with the handwriting on the documents and the inherent unreliability of Morales on the details of his encounter with Mr. Montgomery. I submit that the jury's finding of guilt on this one count does not suggest that they believed everything Morales had to say, or that they disbelieved everything Mr. Montgomery said. Their split verdict shows that they made no such "absolute" findings on credibility. While this Court can make a different finding, based on a preponderance of the evidence standard, I suggest that the Court should decline to do so.

B. <u>Obstruction of Justice</u>

  The government, not surprisingly, has moved for the addition of obstruction of justice points based on their claim that Mr. Montgomery lied to the jury in his testimony. I strongly dispute their arguments that Mr. Montgomery intentionally lied, and I also argue that the jury, using a conscious avoidance theory, could have concluded that Mr. Montgomery was guilty on the one count involving the cars without finding that he intentionally lied about his involvement. Indeed, their acquittal on the other counts suggests that this is exactly what they did. Since some of what Mr. Montgomery testified to involved matters unrelated to the purchase of the cars

(depositing what Bennett claimed was a commission check which said the words "sales tax" on it, for example), it would seem that they probably came to their conclusion on the sole count of conviction based on their view of what Mr. Montgomery should have known, rather than what he said or did not say about what he did know or intend when he went to Florida. In other words, the conscious avoidance theory of "knowledge" could be supported without disbelieving Mr. Montgomery. [Of course, I still dispute that there was any proof of knowledge in any form that the manner of "stealing" the cars was through the use of a counterfeit check].

Before addressing the specifics of the government's arguments I would note that it was clear from Mr. Montgomery's testimony and background that he is not a sophisticated person, that his memory is wuite fallible, and that he was testifying in his second language made it somewhat hard for him to understand the questions and to express himself clearly. All of these factors, I submit, made it fairly easy for the government to trick him into looking bad when he answered the questions on cross-examination which are the subject of the government's letter of December 3, 2007.

Addressing the individual arguments of the government in order, I submit the following:

a) Phone calls with Shyne: Mr. Montgomery was incarcerated for over three months with Shyne and others in this case, and it is clear that when he was released Shyne tried to get him to help Shyne stay in contact with Natasha Singh (who was not incarcerated). In other words, whatever relationship there was between Shyne and Mr. Montgomery developed after the conspiracy was over. Mr. Montgomery was obviously reluctant to make it appear that the extent to which he may have tried to be helpful with Shyne after Shyne and he had been locked up might make it appear that he had any kind of friendship or other relationship with Shyne before they were arrested. The fact is, however, that nobody claimed that Shyne and Mr. Montgomery were in any way close during the time-frame of the conspiracy, and all that was clear was that Mr. Montgomery was reluctantly being helpful to a fellow inmate with whom he had far more contact after his arrest.

b) Relationship with Singh: again, Mr. Montgomery easily could have known of Natasha Singh as "Tasha" based on his encounters with Shyne, Bennett, and others in the jail after they were all arrested. I submit that he reluctantly agreed to try to help Shyne stay in contact with Singh, and that he tried to call a few times and also lied to Shyne at other times about trying to call her when he had not. None of this post-arrest contact was particularly material – a fact I wish Mr. Montgomery had himself realized as he was being questioned – but it made him look bad in trying to maintain the truthful fact that he had no personal interest in helping either Shyne or Singh, but felt he had to play along with Shyne's wishes because, as everybody who spends any time in federal custody knows, one never knows what a co-defendant might end up doing to save himself and become a government witness.

c) I submit that Mr. Montgomery was completely truthful insofar as he was unwilling to be in or maintain contact with Toybe Bennett, since it is Bennett who drew him into the trouble

he was facing and continues to face. More than with anyone else Mr. Montgomery had to be especially aware of the danger that Bennett might choose to save himself by lying about Mr. Montgomery's role. Although Mr. Montgomery was clearly confused about details of the number or length of calls he may have had with Bennett, his anger toward him and fear of Bennett's possibly becoming a false witness against him put him in a position of having to put up with a certain amount of unwanted contact. Bennett – while not his cousin – was obviously a life-long "friend" for whom Mr. Montgomery had (and still has) very mixed emotions: it is not surprising that he would not be fully accurate about the number or extent of his post-arrest contacts with Bennett.

     d) The government argues that Mr. Montgomery lied about the $18,000 check because they do not allow for the fact that Mr. Montgomery is fairly unsophisticated and not, in some ways, very careful. There was no lengthy banking history from which one can draw any conclusions about Mr. Montgomery's practices in keeping track of balances (in fact, I recall that one of the checkbooks showed that he stopped keeping track after two or three of the first checks of the account were written), and there is no reason to believe that Mr. Montgomery was necessarily consistent in his practices with respect to banking. Indeed, there was nothing to show that he had any particular experience using banks, or that he did much more than try to draw on an account with his debit card until the account would no longer yield cash. All of this was fully explored in cross-examination before the jury, and the jury obviously was willing to give Mr. Montgomery the benefit of the doubt.

     e) I have already discussed the fact that the jury could have convicted Mr. Montgomery without having found that he had lied about his dealings with the car conspiracy based solely on a conscious avoidance theory. There was nothing incontrovertible about the version Morales gave – he could have lied about what he claimed Mr. Montgomery did in front of him or what was said, and he had a motive to do so. Moreover, as stated above, he was clearly at least wrong about some of the facts, since a check he said he gave Mr. Montgomery during the sole encounter he had with him was deposited several days earlier, and another check, supposedly given to Mr. Montgomery in Florida, was deposited that same day, although there was no evidence that it was deposited in Florida or en route to New York. The notion that Mr. Montgomery should simply disbelieve Bennett when told by Bennett that he had secured a position as a sales agent for a car dealership is not supported by anything, and is contradicted by otherwise corroborated testimony that Bennett was, indeed, in possession of expensive cars. The fact that the "commission" check said "sales tax" on the memo line would not necessarily put an unsophisticated person like Mr. Montgomery on notice that Bennett was lying to him.

     In short, although I concede that Mr. Montgomery made many errors in giving his testimony when tested against telephone and business records which were not before him when he testified until after committing himself to his best recollection of a fact, he did not willfully obstruct justice.

Attached Letters:

    I am submitting herewith a package of letters from various people who are close to Mr. Montgomery. I submit that the content of these letters shows that Mr. Montgomery is a very hard-working decent young man who allowed himself to be sucked into the web of intrigue by his supposed "friend" Toybe Bennett. These letters are from the following persons, some of whom testified at the trial and most of whom did not:

    Dorothy Montgomery, the defendant's mother;
    George Montgomery, the defendant's father;
    Melitza Ramos, the defendant's girlfriend and expectant mother of his next child;
    Natalie Moricette, the defendant's former wife and mother of one of his children;
    Petrena Russell, the defendant's friend and former co-worker;
    Ray Cadle (who testified), the defendant's former supervisor;
    Odessa Montgomery, one of the defendant's sisters;
    Tisha Iguaran, another of the defendant's sisters;
    Elsa Montgomery, the defendant's step-mother;
    Shawnalee Murphy, the defendant's friend;
    Kathey Horne, friend and former co-worker;
    Sybil Pascall, friend and neighbor;
    Verna Dehaney, former girlfriend and mother of one of the defendant's children;
    Delira and Joshua Caterson, family friend;
    Maritza Clarke; family friend;
    Iris Lopez, home attendant to the defendant's mother;
    Arlenys Hutton, former home attendant to the defendant's mother;
    Diana Griffith, family friend;
    Adiel Montgomery, another brother;
    Griselda Bubb Johnson, family friend;
    Estanislao Christie, family friend.

    I thank the Court for your attention to this submission.

    Sincerely,

    */s/ Thomas H. Nooter*
    Thomas H. Nooter
    Attorney for Mr. Roberto Montgomery

cc:    AUSA Danya Perry and Daniel Levy (by ECF)
    All counsel (by ECF)
    U.S. Department of Probation (by mail)